IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

1.  **Renee Eilene Johnson**,

                              Plaintiff,

v.

Case Number: 23-CV-169-CVE-CDL

1.  **PC Woodland Manor, LLC,** an
    Oklahoma foreign liability
    company,

2.  **Bridge Property Management,
    LC,** An Oklahoma foreign
    limited company,

3.  **RPM Living**, LLC, an
    Oklahoma registered foreign
    Limited Liability Company,

4.  **Vesta Realty, LLC**, an
    Oklahoma foreign limited
    liability company,

5.  **Woodland Manor's Best
    Living, LLC**, an Oklahoma
    foreign limited liability
    company,

6.  **Skylar Rae Mosby-
    Gudmundsson**, in her capacity
    as agent for the corporate entities
    and in her individual capacity,

7.  **Woodland Manor TIC 1, LLC**,
    an Oklahoma foreign limited
    liability company,

8.  **Varia US Tulsa, LLC,** a
    Delaware Limited Liability
    Company,

9.    **Varia US Holdings, LLC**, a
      Delaware Limited Liability
      Company,

10.   **Varia US Properties AG**,
      Switzerland, a Swiss real estate
      company,

11.   **Stoneweg Group**, a Geneva,
      Switzerland based international
      real estate and investment
      management firm,

12.   **Stoneweg Investments, LLC**, a
      Delaware Limited Liability
      Company,

13.   **Stoneweg US Employees, LLC**,
      a Delaware Limited Liability
      Company,

                        Defendants.

## PLAINTIFF'S CORRECTED FIRST AMENDED COMPLAINT

1.    In accordance with this Court Order dated September 12, 2023 (Doc. 55), the Plaintiff

corrects the First Amended Complaint filed on September 11, 2023, to correct the names of the

Defendants Bridge Property Management, LC, and Stoneweg US Employees, LLC.

2.    Plaintiff, Renee Johnson, amends her Complaint filed on April 27, 2023 (Doc. 2), and

brings this action against Defendants PC Woodland Manor, LLC (PCWM), RPM Living LLC.,

(RPM), Bridge Property Management, LC. (BPM), Vesta Realty, LLC. (Vesta), Woodland

Manor's Best Living, LLC. (WMBL), Woodland Manor TIC 1, LLC (WMT), Varia US Tulsa,

LLC, Varia US Holdings, LLC, Varia US Properties AG, Switzerland (Collectively, Varia),

Stoneweg Investments, LLC., Stoneweg US Employees, LLC, Stoneweg Group, (Collectively,

Stoneweg), and Skylar Mosby-Gudmundsson, for violations of the **Fair Housing Act** and the **Fair**

1

Housing Amendments Act, **42 U.S.C.A. § 3601**, et seq., the **Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794**, the **Oklahoma Discrimination in Housing Act** and the **Oklahoma Anti-Discrimination Act, 25 Okla. Stat. § 1401, et. seq**.

3.      The corporate entity Defendants have denied and delayed and are denying and are delaying necessary requested reasonable accommodations to the Plaintiff, a person, known to them as a person with disabilities, in violation of the **Fair Housing Act, the Oklahoma Discrimination in Housing Act, the Rehabilitation Act of 1973, § 504,** and the **Oklahoma Residential Landlord and Tenant Act, §113.2(B)**.

4.      The Defendants have made discriminatory statements that violate the **Fair Housing Act**, the **Oklahoma Discrimination in Housing Act**, and the **Rehabilitation Act of 1973, § 504** because of the Plaintiff's disability.

5.      The Defendants retaliated and conspired to retaliate against the Plaintiff for exercising guaranteed civil rights based upon her membership in one or more protected classes in violation of the **Fair Housing Act**, the **Rehabilitation Act of 1973**, and the **Oklahoma Anti-Discrimination Act**

6.      The Defendants violated the **Oklahoma Residential Landlord and Tenant Act** by failing to make repairs and denying Plaintiff's reasonable accommodations relating to her service dogs.

7.      The corporate entity Defendants breached the lease agreement by engaging in each of the aforementioned actions.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over the Plaintiff's claims brought under federal law pursuant to **28 U.S.C. §§ 1331**, **1343**, and **2201** and jurisdiction over state law claims pursuant to **28 U.S.C. § 1367**.

9.     This Court has personal jurisdiction over the Defendants because the Defendants conduct business in the Northern District of Oklahoma, in Tulsa County, the subject contract was made and expected to be performed in the Northern District of Oklahoma, and the Plaintiff's claims for relief arise from the Defendants' discriminatory conduct and breach of contract that occurred in the Northern District of Oklahoma, in Tulsa County.

10.     Venue is proper in this judicial district pursuant to **28 U.S.C. § 1391 (b)** because all or a substantial part of the acts and omissions of the Defendants giving rise to this action occurred in the Northern District of Oklahoma.

## BACKGROUND FACTS

## PARTIES

11.     Plaintiff, Renee Johnson is a 58-year-old woman, who rents Apt 7., 8677 E 61st St., Tulsa, Oklahoma, an apartment located at the Woodland Manor Apartments. She is a disabled woman who lives alone. Plaintiff has undergone multiple brain surgeries within the past ten years to deal with her arteriovenous malformation diagnosis (AVM). These brain surgeries have caused Ms. Johnson to have many neurological issues and nerve damage, in addition to being extremely sensitive to light and high-pitched sounds. Ms. Johnson's mobility is limited and inconsistent. She requires the use of a wheelchair at times. Ms. Johnson has great difficulty writing legibly, as well as other tasks that would involve fine and gross motor skills.  She has difficulty with her memory. She also suffers from migraines. She uses a smaller service dog, Shante, to ensure Plaintiff continues breathing when her breathing becomes labored or delayed.  Ms. Johnson utilizes a

Section 8 Housing Choice Voucher to assist her in paying her rent. Ms. Johnson has stated that she just wants a safe place to live and to be able to use and enjoy her unit as much as she can.

11.     PC Woodland Manor, LLC (PCWM) is an Oklahoma foreign limited liability company in Oklahoma. PCWM owned and managed the Woodland Manor Apartments, an independent living community for seniors 55 and older that was built in 1997, in Tulsa, Oklahoma. Upon information and belief, the Woodland Manor Apartments was PCWM's only asset. PCWM is owned by the Varia Defendants and managed by the Stoneweg Defendants.

12.     Defendants, RPM Living LLC, an Oklahoma foreign limited liability company originating from Texas, is the property management company that managed the  apartment complex in which the Plaintiff lives during some of the conduct complained of herein. RPM and PCWM were agents of one another and joint venturers for the subject property. RPM aided, abetted, and/or conspired with Defendant PCWM to deprive Ms. Johnson of her civil rights. RPM was the principal of Defendant Gudmundsson. It adopted and ratified her unlawful conduct complained of herein. RPM was an agent of the Varia Defendants and the Stoneweg Defendants when it engaged in, ratified, and adopted the conduct herein described.

13.     Defendant Bridge Property Management, LC (BPM), is an Oklahoma foreign limited company. It managed the Woodland Manor Apartments immediately before Defendant RPM and originated the conduct herein described. BPM was the agent of Defendant PCWM. It was a co-conspirator with PCWM in the acts complained and aided and abetted PCWM in said acts. BPM was also the principal of Defendant Gudmundsson. BPM was the agent of the Varia Defendants and the Stoneweg Defendants.

14.     Defendant, Vesta Realty, LLC. (Vesta) is an Oklahoma foreign limited liability

company. It is the registered agent for Defendants WMT and WMBL, an agent and coventurer with them, and a co-conspirator with them in the acts complained of herein. Defendant Vesta is also a joint venturer, an agent, principal, and co-conspirator with all corporate Defendants herein, and the principal of the individual Defendant Gudmundsson. Vesta adopted and ratified the unlawful conducted engaged in by Defendant Gudmundson of which the Plaintiff now complains. Defendant Vesta also aided and abetted all Defendants in the unlawful conduct complained of herein. Defendant Vesta is an agent of the Varia Defendants and the Stoneweg Defendants.

15.     Defendant Woodland Manor TIC 1, LLC. (WMT) is an Oklahoma foreign limited liability company. It is a Delaware limited liability company, File Number 6976624. According to the records of the Delaware Secretary of State, the formation date for WMT was August 18, 2022. The Delaware registered agent for service of process is the Corporation Trust Company in Wilmington, Delaware in New Castle County, Delaware. On August 24, 2022, WMT registered with the Oklahoma Office of the Secretary of State, file number 371387800. WMT's identified registered agent is Defendant Vesta. WMT has no known internet presence and no disclosed members. It is believed to be the alter ego of the Defendant PCWM. Additionally, it is the agent and principal of PCWM. It is also the agent and principal of Defendants Vesta, RPM, and WMBL. It is the principal of Defendant Gudmundsson and the landlord of Ms. Johnson. WMT is a co-owner of Woodland Manor Apartments. It is a co-conspirator with all named Defendants, and it has aided and abetted the remaining Defendants in the unlawful conduct complained of herein. Upon information and belief, WMT's only asset is the Woodland Manor Apartments. WMT is an agent of the Varia Defendants and the Stoneweg Defendants. WMT is an alter ego of VUT.

16.     Defendant WMBL is an Oklahoma foreign limited liability company. It is

originally registered in the State of Delaware, file number 6839170. The Delaware registered agent for service of process is the Corporation Trust Company, in Wilmington, Delaware, in New Castle County, Delaware. WMBL became a Delaware limited liability company on June 6, 2022. On June 7, 2022, WMBL became a registered foreign limited liability company with the State of Oklahoma, file number 3713132130. WMBL's identified registered agent is Defendant Vesta. WMBL has no known internet presence and no disclosed members. It is believed to be the alter ego of the Defendant PCWM. It is the principal of Defendant Gudmundsson, and the landlord of Ms. Johnson WMBL is a co-owner of Woodland Manor Apartments. Upon information and belief, WMBL's only asset is the Woodland Manor Apartments. WMBL is one of the alter egos of VUT.

17.     Defendant Varia US Tulsa, LLC (VUT), is a Delaware limited liability company, Delaware Secretary of State file number 5977199. VUT's filing date was March 1, 2016. VUT is a subsidiary of Defendant Varia US Properties AG, Switzerland. It is a subsidiary of Varia US Holdings, LLC. VUT is a member of PCWM, which owned Woodland Manor Apartments. Defendants Stoneweg manages VUT. PWCM is one of the alter egos of VUT.

18.     Defendant Varia US Holdings, LLC (VUH), is a Delaware limited liability company, Delaware Secretary of State file number 6395585. VUH's filing date was November 16, 2021. VUH is the sole member of VUT. VUH's sole member is Defendant Varia US Properties AG, Switzerland. VUH holds an ownership interest in the Woodland Manor Apartments. Defendants Stoneweg manage VUH. VUH is the sole member of Defendant VUT. VUT is the alter ego of VUH. VUH succeeded to the proceeds from the sale of the complex in 2022.

19.     Defendant Stoneweg Investments, LLC (SIL) is a Delaware limited liability company, Delaware Secretary of State file number 6839992. SIL's filing date was November 14, 2016. Defendant SIL is a member of PCWM. It is the agent and principal of all corporate

Defendants herein named. It is the principal of the named individual Defendants – excepting for Varia US Properties AG, Switzerland. PCWM is the alter ego of SIL.

20.     Defendant Stoneweg Group (SG) is a Geneva, Switzerland based, international real estate asset management firm with over $ 6.2 billion of assets and projects under its management. Varia US Properties has delegated its asset management to SG. SG is active in Switzerland, the US, Spain, Italy, Ireland and Andorra with differentiated, country-specific strategies. SG was formed by Swiss senior real estate executives with a broad experience both in national and international real estate. SG formed a US subsidiary, Stoneweg US LLC.[1] Defendant SG manages all investments and assets of Defendant Varia. It succeeded to the proceeds of the sale of the complex. PCWM is the alter ego of SG. The named Stoneweg Defendants are the alter egos of SG.

21.     Defendant, Stoneweg US Employees, LLC. (SUSE), is a Delaware limited liability company, Delaware Secretary of State file number 6789800. SUSE filed its entity documents with the Delaware Secretary of State on May 10, 2022. SUSE is a subsidiary of SG. According to Varia's website, SUSE "assists in the selection of assets, the local asset management and the development of the local network.[2]" SUSE assists with the asset management of Woodland Manor Apartments, one of Varia US Properties AG, Switzerland's local U.S. assets. SUSE is both agent and principal of all named Defendants. SUSE is a co-conspirator with all named Defendants and a party to all conduct complained of herein. SUSE aided and abetted all Defendants in the conduct complained of herein. It succeeded to the proceeds from the sale of the complex. Specifically, the settlement statement identifies SUSE as the reimbursee for expenses associated with the sale of the complex. PCWM is the alter ego of SUSE. SUSE is the alter ego of the remaining Stoneweg Defendants.

---

[1] https://variausproperties.com/about/
[2] https://variausproperties.com/about/

22.     Defendant Varia US Properties AG, Switzerland (VUSP) is the parent of the Varia, Stoneweg, and Woodland corporate entities identified herein. VUSP is a Swiss real estate company based in Zug, Switzerland. As of September 2022, VUSP's portfolio comprised 40 assets spread across 15 different states in the United States of America with a total value of approximately $1.659 billion. The portfolio is 100% residential and comprises 11,008 units among which 448 are Low-Income Housing Tax Credit (LIHTC) units and 10,560 are market units. Compared to December 2021, the portfolio grew in value by 14.3% or USD 180 million.[3] VUSP acquired Woodland Manor Apartments in April 2016. According to VUSP's website, Woodland Manor Apartments has a value of $26.5 million. VUSP is the principal and agent of all named Defendants. It is the agent and principal of all Defendants herein named. VUSP is the sole member of Defendant VUH. Defendants are the alter egos of VUSP. VUSP is the sole member of Defendant VUH. VUSP succeeded to the proceeds from the sale of the complex.

23.     Defendant Skyler Mosby-Gudmundsson is the property manager for the Woodland Manor Apartments. She is the agent of all corporate Defendants identified herein. Defendant Gudmundsson is a co-conspirator with the named Defendants herein.

**Varia US Properties AG, Switzerland's (VUSP) US assets, business structure, and the management of Woodland Manor Apartments.**

24.     Defendant VUSP is a Swiss real estate company based in Zug, Switzerland. VUSP's objective is "to maximize long-term value by acquiring, owning, repositioning, managing and selling US multifamily properties."[4] In the United States, VUSP owned, operated, and managed 40 properties in 15 different states in the United States of America with a total appraised

---

[3] https://variausproperties.com/portfolio-overview/
[4] https://variausproperties.com/about/

value of approximately $1.659 billion. One hundred percent of the properties owned, operated, and managed by VUSP in the United States are residential properties. VUSP's residential properties consist of 11,008 units, of which 448 are LIHTC units, and 10,560 are market units.

25.    VUSP's structure, as identified on its website, https://variausproperties.com, is as follows[5]:

> The Company indirectly invests in real estate properties in the United States through a set of so-called blockers and PropCo companies. For each property or portfolio that the Company acquires, one or several blocker companies as holding subsidiaries are incorporated, normally in the legal form of a limited liability company typically incorporated in Delaware, United States. Usually, Varia US Properties holds 100% of the interests in the single or series of holding subsidiaries. Each holding subsidiary incorporates one or several limited liability companies with the sole purpose of holding the title in one or several properties, a so called PropCo LLC. It is the Company's intention that the subsidiary holding holds 100% and 100% of the equity interest of the votes in each PropCo LLC.

> Varia US Properties capitalizes the blockers with a mix of equity and debt in the form of shareholder loans.

> The below graphic depicts the typical target structure:



---

26.     According to VUSP's website, its business strategy is as follows:

According to its investment regulations, Varia US Properties invests in US multifamily real estate properties and pursues a mid to long-term investment perspective through the following individual strategy based on three pillars:

> The Company acquires properties that allow for value-adding measures, including refurbishment, renovation and other operating measures, in order to maximize the rent potential at limited incremental costs before looking for an attractive exit.

> In addition, the Company invests in properties profiting from Low Income Housing Tax Credit ("LIHTC") to generate attractive rental profit and realize value growth once these properties have been transitioned to the non-rent restricted market.

> The Company also aims at selectively investing in stabilized properties with limited improvement potential, such that it can benefit from secure rental income and the value growth in the mid to long-term.

> Varia US Properties focuses on the low to moderate income level assets and, in particular, on the LIHTC (Low Income Housing Tax Credit) properties. LIHTC properties benefit from a tax credit program when they are built and are then subjected to rent and tenant income level restrictions usually for the first fifteen years following construction. Once the restriction period has lapsed, a transition to the free market can be negotiated. As of September 2022, LIHTC assets amount to approximately 4% of the portfolio's value.

27.     Defendant VUSP created Defendant SG specifically to manage its various property interests.

28.     Defendant SUSE assists in the selection of assets, the local asset management and the development of the local network.

29.     In January 2016, the Varia and Stoneweg Defendants created PCWM, as an Oklahoma foreign limited liability company. The members of PCWM are VUT and SIL.

30.     In March 2016, the Varia and Stoneweg Defendants created Defendant VUT.

31.     The sole member of Defendant VUT is Defendant VUH.

32.     The sole member of Defendant VUH is Defendant VUSP.

33.    VUSP acquired the Woodland Manor Apartment complex in April 2016.

34.    Upon information and belief, based upon VUSP's identified target structure, the complex was PCWM's only asset.

35.    Upon information and belief, based upon VUSP's identified target structure, VUSP, through VUT and SUSE, held 100% of the equity interest and 100% of the votes for Defendant PCWM. The Varia and Stoneweg Defendants are joint venturers.

36.    The Varia and Stoneweg Defendants directly control PCWM.

37.    In October 2022, after pending litigation, PCWM transferred its interest in the complex to Woodland Manor's Best Living, LLC, and Woodland Manor TIC 1, LLC.

38.    Defendants WMBL and WMT are the new PropCo, LLCs for the Woodland Manor Apartments.

39.    Pursuant to the settlement closing statement, the Varia and Stoneweg Defendants received all proceeds from the sale of the complex.

40.    According to the Tulsa County Assessor's website, the Varia and Stoneweg Defendants received $22,525,000 in proceeds from the sale of the complex, with additional disbursements for miscellaneous expenses.

41.    Pursuant to VUSP's website, through February 16, 2023, it retained ownership of the Woodland Manor Apartment complex.

42.    Based upon Varia's statement of ownership of Woodland Manor Apartments, WMBL and WMT are the subsidiaries of Varia.

43.    Pursuant to its corporate structure, Varia, Stoneweg, and PCWM entered into facility management agreements with Defendants BPM, RPM, and Vesta for property management services at Woodland Manor Apartments.

11

44.     Woodland Manor Apartments is a LIHTC property located in Tulsa, Oklahoma that was built in 1997.

## **FACTS RELATING TO THE FAIR HOUSING ACT AMENDMENT of 1988**

45.     In 1988, Congress passed the Fair Housing Amendments Act, which specifically created and defined the disability protected category and created protections for disabled persons as it relates to requests for reasonable accommodations and reasonable modifications.

46.     The Fair Housing Amendments Act of 1988 also mandated that every multi-family housing development built, after March 13, 1991, meet certain accessibility standards, including:

> the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicap persons in wheelchairs; and all premises within such dwellings contain the following features of adaptive design: an accessible route into and through the dwelling; light switches, electrical outlets, thermostats, and other environmental controls in accessible lo-cations; reinforcements in bathroom walls to allow later installation of grab bars; and u-sable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

**42 U.S. Code § 3604(f)(3)(C)(I-IV)**.

47.     The Fair Housing Amendment Act of 1988 ensured that multi-family housing owners would be responsible for complying with the American National Standards for buildings and facilities regarding the accessibility of units for disabled people. [6]

48.     The Fair Housing Accessibility Guidelines, originally published in the Federal Register on March 6, 1991, listed further ways in which multi-family housing units needed to be accessible, such as the provision that "primary entry doors to dwelling units with direct exterior

---

[6] 42 U.S. Code § 3604(f)(4).

access" be "no more than ½ inch below the floor level of the interior dwelling unit" if "they are constructed of impervious material such as concrete, brick or flagstone."[7]

## INCIDENTS OF ALLEGED DISCRIMINATION

49.      In July of 2020, Plaintiff spoke with Defendants' leasing agents about renting a unit at Woodland Manor and told them that she had two assistance animals that help with her different disability-related needs.

50.      Plaintiff informed Defendants' agents about her writing disability, leading one of Defendants' agents to help Plaintiff complete her rental application.

51.      Defendants' agents initially told the Plaintiff that for them to accommodate her that she would need to complete a long, complicated Reasonable Accommodations form.

52.      Plaintiff was also told by Defendants' agents that she would be limited to one service dog.

53.      The Defendants' agents told Ms. Johnson that if she failed to complete their accommodations form within the short timeframe provided, then she would have to pay a non-refundable pet deposit of $300 and a $20 application fee for her dog.

54.      Plaintiff told Defendants' agents that she had a letter from her doctor that verified her need for her service dogs but that she would be unable to get her doctor to complete the required form within the allotted timeframe.

55.      Plaintiff then told Defendant that it was illegal to charge fees and pet deposits on service animals and illegal to limit the number of service animals a disabled person can have.

56.      Feeling like she had no options, Plaintiff re-homed Libe, upon whom she relied to assist her with rotating her neck when her neck became swollen and stuck in one position.

---

[7] Final Fair Housing Accessibility Guidelines, 56 Fed. Reg. 9507 (March 6, 1991) (codified at 24 C.F.R. ch. 1)

57.     As a result of having to re-home Libe, Plaintiff no longer has a service dog that is small enough to help rotate her neck; she also lost the additional emotional companionship that Libe provided for 13 years.

58.     Plaintiff's initial lease term was from August 6, 2020 until July 31, 2021, and her contract rent was set at $792.

59.     The Defendants and the Tulsa Housing Authority (THA) entered into a Housing Assistance Program contract, under which, *inter alia*, the THA agreed to pay a portion of the Plaintiff's monthly rental obligation.

60.     Plaintiff's tenant rent responsibility portion was $221 per month, and the Tulsa Housing Authority's monthly portion was $571 per the Housing Assistance Program (HAP) agreement with Defendants.

61.     Per Defendants' demand, Plaintiff paid the $300 pet deposit on August 6, 2020 and her $20 pet application fee prior to move in.

62.     Toward the beginning of her tenancy, Plaintiff found there were further reasonable accommodations she needed.

63.     Plaintiff noticed that there is a light directly outside of her apartment door that triggers her light sensitivity and causes her to become dizzy.

64.     Plaintiff's light sensitivity is so severe that that she regularly wears sunglasses to protect her eyes when she is outside.

65.     Plaintiff informed management of this problem shortly after moving in, and the Defendants' agents accommodated the Plaintiff's disability-related need initially by allowing her to unscrew the lightbulb that was outside her apartment.

66.     Plaintiff also noticed that her unit's exterior door threshold, which is connected by concrete to the interior door threshold, has a prominent and unexpected elevation change.

67.     This elevation change between the interior and exterior door is approximately 1.5 inches.

68.     As a result of this, September of 2020, Plaintiff requested a wheelchair ramp to deal with the improper threshold issue.

69.     Upon making her request, she was told by the Defendants' agent, a maintenance worker, that she would have to pay for the repair herself; she was then ignored for some time by Defendants' agents regarding this issue.

70.      In August of 2020, Plaintiff informed Defendants that her service animal is highly trained and requested a reasonable accommodation that the service dog be allowed outside without a leash because of the high likelihood that the dog will either pull Plaintiff out of her motorized chair unexpectedly because of the leash or pull her down while she is walking.

71.     Plaintiff's request was ignored initially.

72.      In August 2020, Plaintiff received a lease violation that alleged that she had unauthorized occupants in her home when the alleged unauthorized occupants were actually Plaintiff's grandchildren spending an evening at her home.

73.     Since the beginning of Plaintiff's tenancy, Plaintiff would make her repair requests verbally to staff either over the phone or in person to Defendants' agents, who would claim the maintenance order requests had been written down by them.

74.     Regardless of this, Plaintiff's maintenance concerns were rarely, if ever, addressed.

75.     On or about November 1st, 2020, Plaintiff traveled to the office to pay rent

through the door to Defendants' Agent, April Rodriguez, who accepted rent on Defendants' behalf in compliance with their COVID-19 policy.

76.    Shortly thereafter, Rodriguez altered the Plaintiff's money order by removing the Plaintiff's name as the payor on her money order, causing Ms. Johnson's November rent to be considered late and later unpaid by Defendants.

77.    Plaintiff did not learn until March of 2021 that Rodriguez altered her money order and that the Defendants did not credit her for the November 2020 rent.

78.    She filed a police report in April of 2021 regarding the matter, which she shared with Defendants.

79.    However, Defendants continued to demand the November 2020 rent from the Plaintiff and continued to charge her a $50 late fee on that 'missing' rent payment for several months between November 2020 until February of 2022.

80.    Plaintiff orally renewed her request to go without a dog leash sometime in early 2021 to Defendants' agents, which went ignored.

81.    In April of 2021, Plaintiff learned that her beloved service dog, Libe, had died, meaning Plaintiff would never be reunited with her.

82.    On April 28, 2021, Plaintiff made an oral maintenance request for a wheelchair ramp to Defendants' agents.

83.    On April 29, 2021, Plaintiff received a note on her door from management, stating that her request must be made in writing, despite Plaintiff's disabilities causing great strain on her ability to write.

84.    On May 3, 2021, the Defendants presented the Plaintiff with a lease nonrenewal notice.

85.     Also on May 3, 2021, the Defendants gave the Plaintiff a notice that  her communications with Defendants needed to be in writing going forward.

86.     The notice further barred the Plaintiff from entering the front office without an appointment.

87.     In July of 2021, Plaintiff's air conditioning unit went out for a period of seven days.

88.     The heat caused Plaintiff extreme discomfort and restricted her ability to breathe.

89.     Plaintiff made multiple requests, 3-4 times a day, to Defendants' agents by phone that they address her lack of air conditioning.

90.     The air conditioning unit was not replaced for seven days.

91.     On July 21, 2021, Legal Aid Services of Oklahoma LITHC property, they would need "good cause" to non-renew Plaintiff.

92.     This communication prompted Defendants to forgo their efforts to non-renew Plaintiff's lease.

93.     In early August 2021, the Defendants' agents rescinded Plaintiff's light bulb accommodation without first notifying the Plaintiff.

94.     Plaintiff would throw a towel loosely over the light fixture to temporarily alleviate the issues caused by the bright light bulb.

95.     Between July 28th, 2021 and August 4th, 2021, Defendants contacted security officers twice about Ms. Johnson covering the light bulb outside of her home with a small piece of fabric and expressed concerns that the fabric posed a fire hazard.

96.     On August 4th, 2021, Defendants gave a "watch order" to security to monitor Plaintiff's apartment regarding concerns for the potential fire hazard.

97.     In August of 2021, Plaintiff's counsel Legal Aid Services of Oklahoma composed a letter to Defendants, informing them that Plaintiff is a person with a disability and describing how the light outside Plaintiff's door negatively impacts her health.

98.     Counsel requested that Plaintiff's reasonable accommodation revocation be reversed and provided Defendants with four possible accommodation alternatives to consider: they could disable the light, move the light, use a dimmer bulb, or install a barrier between the light and Plaintiff's door.

99.     That request went without any attempt by Defendants to engage in an interactive process with her.

100.     During October or November of 2021, Defendants' agents expressed disbelief concerning the Plaintiff's light-related disability.

101.     In late 2021, Plaintiff became disoriented by the bright light outside of her door as she attempted to enter her apartment; she then tripped on the uneven threshold, causing her to fall into her home, onto her right shoulder.

102.     The fall caused Plaintiff to fracture her skull and dislocate her right shoulder.

103.     In late 2021, following Ms. Johnson's August 2021 request regarding the light fixture, a maintenance man, installed an even brighter light outside of Plaintiff's door that Plaintiff was unable to remove.

104.     Plaintiff's continuous late fees that resulted from her missing November 2020 rent payment prompted Plaintiff's social worker to apply for rental assistance on Ms. Johnson's behalf, despite Ms. Johnson timely tendering her rental payment in November 2020.

105.   The emergency rental assistance program ("ERAP") application was submitted to Restore Hope for review in July of 2021.

106.     On September 28, 2021, Plaintiff's social worker reached out to Defendant Skylar Mosby-Gudmundsson by phone to request that Plaintiff be allowed to let her dog go unleashed when outside to prevent Plaintiff from tripping or being pulled down by her dog.

107.     On October 1, 2021, Defendant Mosby-Gudmundsson denied this request, citing concern for city code and stated that Plaintiff could get someone to take her dog outside for her. Plaintiff lives alone.

108.     Plaintiff has maintained an adequate rental insurance policy through State Farm from January 2022 through present time.

109.     In February of 2022, Defendants charged Plaintiff for a lapse in renter's insurance for $8.95, despite her State Farm agent having provided Woodland Manor with evidence of Ms. Johnson's policy.

110.     As a result of the Defendants' failure to grant her reasonable accommodation request regarding her service dog's leash, Plaintiff suffered a skull fracture in February of 2022 when her service dog pulled on the leash while they were outside, causing her to fall.

111.     Following the receipt of ERAP funds in early 2022, Skylar Mosby Gudmundsson told Plaintiff that if it were not for the ERAP funds they received on Plaintiff's behalf, Defendants would have evicted Plaintiff.

112.     In February or March of 2022, the excessively bright light bulb that was installed directly outside Plaintiff's unit went out.

113.     In March of 2022, Defendants eventually provided the Plaintiff with a negligently constructed ramp.

114.     The negligently constructed ramp exacerbated the Plaintiff's mobility limitations and has never been suitable for its intended purpose.

19

115. The ramp destroyed the rubber tires used on Plaintiff's motorized wheelchair on one incident.

116. The poor construction of the ramp has caused Plaintiff to fall backwards in her wheelchair while attempting to enter her home on more than one occasion.

117. Due to this, Plaintiff uses the ramp very slowly and deliberately but remains fearful of falling again.

118. On August 9, 2022, Plaintiff's counsel renewed Ms. Johnson's request by letter to have two service animals, to have her pet deposit returned, and request that either her service dog be able to go unleashed when outside or that another alternative be offered to Plaintiff.

119. Defendant PC Woodland Manor LLC's counsel responded on August 29th, 2022, stating that Defendants would credit Plaintiff's pet deposit to her account and would allow her to have two service dogs.

120. In that same letter, Defendant PC Woodland Manor LLC rejected Plaintiff's request to allow her service dog to go unleashed while she walks the dog outside, citing concern for Tulsa's restrictions regarding unleashed dogs.

121. In September of 2022, Defendants' agents installed a dimmer light outside Plaintiff's door, which ameliorated the symptoms of Plaintiff's disability.

122. On or about October 19, 2022, Defendants' agents sprayed Plaintiff's unit for pests, despite Plaintiff previously informing them that the pesticide used triggers migraines and other problems for Plaintiff.

## HUD 903 COMPLAINT

123. On August 10, 2022, Plaintiff's counsel submitted a HUD 903 complaint on

Plaintiff's behalf, describing the discrimination Plaintiff faced because of her disability at Woodland Manor.

124.    In late August, the assigned HUD investigator began their investigation of Plaintiff's allegations, which included interviewing both parties and reviewing documentation provided by both parties.

125.    On September 1, 2022, Plaintiff's counsel continued communications by letter with Defendant PC Woodland Manor LLC's counsel regarding Plaintiff's previously requested reasonable accommodations, including the dog leash accommodation request.

126.    Since Defendant PC Woodland Manor did not offer alternatives to the dog leash reasonable accommodation initially requested by Plaintiff, Plaintiff's counsel requested that a fenced-in dog area be built outside of Plaintiff's apartment that would allow Plaintiff's service dog to walk freely without creating a tripping hazard or fall risk for Plaintiff.

127.    This request was not responded to until further communication was initiated by the HUD investigator.

128.    Upon interviewing both parties, the HUD investigator attempted conciliation between the parties.

129.    In October of 2022, Defendant PC Woodland Manor LLC's counsel, via the HUD Investigator, offered to allow Plaintiff the ability to pay for her own fenced-in dog area outside in exchange for the dismissal of the complaint.

130.    Plaintiff did not feel this offer would address her concerns, or appropriately address the extent of the issues Plaintiff has had with Defendants and declined this offer through counsel.

131.    Conciliation efforts became less effective upon PC Woodland Manor, LLC selling

Woodland Manor to Woodland Manor's Best Living, LLC on October 11, 2022.

132.   Plaintiff chose to dismiss the complaint by counsel on January 10, 2023.

**RETALIATION FOLLOWING THE FILING OF THIS COMPLAINT**

133.   In October 2022, Defendants WMT and WMBL became the owners of the Woodland Manor Apartments.

134.   At the same time, Defendant Vesta became the property manager of the company.

135.   Defendants WMT, WMBL, and Vesta retained Defendant Mosby-Gudmundson as their agent and onsite property manager.

136. In early June of 2023, Plaintiff's purse was stolen prior to her being able to pay rent to Defendant PWCM.

137.   On or about June 7th or June 8th, 2023, Plaintiff went to the front office of Woodland Manor to see if they would be willing to accept rent belatedly from her with consideration given to the fact her purse had been stolen earlier in the month and the fact that she relies solely on her SSDI income to pay her expenses.

138.   An agent of Woodland Manor denied Ms. Johnson's request and stated that they would not be willing to accept her rent unless it included the late fee of $50, which Ms. Johnson was unable to pay.

139.   On July 3, 2023, Ms. Johnson tendered her $160 money order to Woodland Manor for July's rent, which was accepted by Defendant PCWM's agents.

140.   On July 11, 2023, the Defendants served Ms. Johnson with a five-day notice to pay rent or quit stating that she owed $320 in rent and $100 in late fees, accounting for two months rent.

141.   On July 24th, Ms. Johnson walked into Woodland Manor's front office to provide

Defendant Mosby-Gudmundsson with a copy of her SSDI income statement.

142.    While in the office, Ms. Johnson requested a receipt form her July 3, 2023 rent payment.

143.    Defendant Mosby-Gudmundsson said that she would provide Ms. Johnson with her receipt if Ms. Johnson would sign the document that Ms. Mosby-Gudmundsson had handed to her.

144.    Ms. Johnson complied with signing the document, not realizing that the document authorized the return of her July 3, 2023 rent payment back to her.

145.    Once she handed the money order back to Ms. Johnson with a copy of the notice Plaintiff had signed, Defendant Mosby-Gudmundsson explained that Defendant PCWM would not be accepting partial payments from Ms. Johnson going forward.

146.    On July 26, 2023, Plaintiff's counsel brought the circumstances regarding Defendants' non-acceptance of Plaintiff's rent to the attention of Defendants' counsel, asking that Defendants accept Plaintiff's rent and warning them that not accepting Plaintiff's rent felt like retaliation against Plaintiff under the Fair Housing Act.

147. On that same day, through counsel, Plaintiff requested a reasonable accommodation that her outstanding rent payments be accepted by Defendants and requested that the late fees be waived because Plaintiff's disability has rendered her unable to work and reliant on her limited SSDI income to pay all of her expenses.

148. Defendants rejected Plaintiff's reasonable accommodation request by ignoring it.

149. On August 1, 2023, Ms. Johnson attempted to pay rent again in the front office, using a money order.

150.    Defendant Mosby-Gudmundsson rejected Plaintiff's August payment and informed Ms. Johnson that Defendants WMT and WMBL would be filing for eviction against her.

151.   Defendant PWCM filed for eviction against Plaintiff that same day, August 1, 2023.

152.   A hearing was set in Tulsa County Small Claims Court for August 10, 2023.

153. On August 10, 2023, Defendant Gudmundsson told Plaintiff's Legal Aid Services of Oklahoma, Inc.'s eviction defense counsel that if Plaintiff were to dismiss her lawsuit against the Defendants named above, then WMBL and WMT would dismiss the eviction against Plaintiff and accept her rent.

154.   Plaintiff, through counsel, rejected this offer.

155. The district court dismissed the case holding that the Defendants WBML and WMT failed to comply with the federal regulations that governed the contract.

## INJURY TO THE PLAINTIFF

156.   As a result of the Defendants' actions as described above, the Plaintiff suffered and continues to suffer irreparable loss and injury including, but not limited to, humiliation, anxiety, insomnia, embarrassment, emotional distress, reputational harm, and deprivation of her rights to equal housing opportunities because of her disabilities. She has suffered harm more than $100,000.

157.   By engaging in the unlawful conduct described above, the Defendants acted intentionally and maliciously with callous and reckless disregard of the federally and statutorily protected rights of the Plaintiff. Therefore, this Court must award punitive damages to Ms. Johnson to punish the Defendants for its conduct and to make an example of it to others.

158. Defendant PCWM is the alter ego of the Varia and Stoneweg Defendants. The Varia and Stoneweg Defendants are the true principals of PCWM, since they control 100% of the equitable and voting interests of PCWM. They created Defendant PCWM as a sham limited liability company to shield themselves from liability. They divested PCWM of its only asset, the

complex, and retained the proceeds for themselves. It is appropriate for the Court to find them liable for the actions of their alter egos. This Court should employ reverse piercing of the limited liability company, Defendant PCWM, to assess liability against the Varia and Stoneweg Defendants for the actions of their alter egos.

159. Additionally, the conduct of the Defendants is unconscionable as a matter of law. Therefore, this Court must award Ms. Johnson civil penalties against the Defendants, pursuant to the Oklahoma Consumer Protection Act, for each violation of the Act. Because of the egregiousness of the Defendants' conduct, this Court must award to Ms. Johnson the maximum penalty for each violation of the Act.

## CLAIM 1

### Violations of 42 U.S.C. §§ 3604 (c), (f) (1) (a), (f)(2)(a), (f)(3) (b), and (f)(3) (c).

160. The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

161.     The facts, as alleged above support violations of the Fair Housing Act as follows:

a.     Defendants violated 42 U.S.C. § 3604(c) by making oral statements, doubting Plaintiff's disabilities.

b.     Defendant violated 42 U.S.C. § 3604(f)(1)(a) by physically making housing unavailable to her at Woodland Manor because of her disability by not repairing her front door threshold.

c.     Defendant violated 42 U.S.C. § 3604(f)(2)(a) by applying different terms, conditions, and privileges to Plaintiff's tenancy because of her disability.

d.     Defendant violated 42 U.S.C. § 3604(f)(3)(B) and the facts pleaded herein, the Defendants have engaged in an unlawful discriminatory housing practice by refusing to grant

the Plaintiff's requested reasonable accommodations when such were necessary to afford her an equal opportunity to use and to enjoy her dwelling at the apartments.

e.      Plaintiff alleges that Defendants violated 42 U.S.C. § 3604(f)(3)(B) when they rejected her reasonable accommodation for two service dogs at or around the time of move in and initially charged her for a pet deposit on her service dog.

f.      Plaintiff also alleges that Defendants violated 42 U.S.C. § 3604(f)(3)(B) when they initially rejected her light-related accommodation that pertains to the light bulb outside of her unit, failed to provide her with alternative options, and intentionally sought to exacerbate Plaintiff's disability by putting up an even brighter light.

g.      Plaintiff alleges that Defendants' refusal to make an accommodation to its policy that requires her to place her requests in writing despite her disability-imposed limitations is a violation of 42 U.S.C. § 3604(f)(3)(B).

h.      The Defendants' negligent design and construction of the wheelchair ramp, which has made the Plaintiff's entryway inaccessible to her violates 42 U.S.C. § 3604 (f) (3) (C).

## CLAIM 2

### Violations of the Fair Housing Act, 42 U.S.C. § 3617

162.    The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

163.    The facts above assert a cause of action for violations of the Fair Housing Act, 42 U.S.C. § 3617.

## CLAIM 3

## Violations of the Oklahoma Discrimination in Housing Act and the Anti-Discrimination Act, Okla. Stat. tit. 25, §1452(1), (2), (3), 15(a)(1), (b)(1), 16(b), 1601 (1).

164.     The Plaintiff repeats her assertions of facts contained in paragraphs above as fully set forth herein.

165.     In support of the following claims, Plaintiff repeats and realleges every allegation contained above as if fully set forth herein.

166.     Defendants violated Okla. Stat. tit. 25, §1452(1) by physically making housing unavailable to her at Woodland Manor because of her disability.

167.     Defendants violated Okla. Stat. tit. 25, §1452(2) by applying different terms and conditions to Plaintiff's tenancy because of her disability, as it relates to her treatment by staff, their willingness to perform repairs for her, their poor communication and lapses in communication with her, the limitation they placed upon Plaintiff that she would only be allowed to communicate with staff in writing, and the limitation placed on Plaintiff that she was not allowed to go to the front office without an appointment.

168.     Plaintiff alleges that Defendants violated Okla. Stat. tit. 25, §1452(16)(a) when they rejected her reasonable accommodation for two service dogs at or around the time of move in and initially charged her for a pet deposit on her service dog.

169.     Plaintiff also alleges that Defendants violated Okla. Stat. tit. 25, §1452(16)(a) when they initially rejected her light-related accommodation that pertains to the light bulb outside of her unit, failed to provide her with alternative options, and intentionally sought to exacerbate Plaintiff's disability by putting up an even brighter light.

170.     Plaintiff alleges that Defendants' continuous refusal to honor her oral requests for maintenance is a failure to accommodate her in violation of Okla. Stat. tit. 25, §1452(16)(a).

171.     Plaintiff also alleges that Defendants violated Okla. Stat. tit. 25, §1601(1) when they retaliated against her in the instances described above.

## CLAIM 4

### Violations of Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, §753(20)

172.     The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

173.     The Oklahoma Consumer Protection Act, 15 Okla. Stat. § 752 (14) defines an Unfair Trade Practice as, "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

174.     Defendants committed an unfair trade practice under Okla. Stat. tit. 15, §753(20) by continuing to charge Plaintiff late fees on her November 2020 rent into 2022, despite her paying that rent.

175.     Defendants committed an unfair trade practice Okla. Stat. tit. 15, §753(20) by charging Plaintiff for home renter's insurance through Defendants' insurance provider for February 2022, despite Plaintiff's insurance provider having informed Defendants of Plaintiff's separately obtained coverage.

176.     The Oklahoma Consumer Protection Act, 15 Okla. Stat. § 752 (1) defines a person as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity."

177.     The Oklahoma Consumer Protection Act, 15 Okla. Stat. § 752 (2) defines a

consumer transaction as, "the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented."

178.    The Defendants owned, operated, and/or managed the Woodland Manor Apartments, where the Plaintiff applied for rental housing.

179.    Pursuant to the Oklahoma Consumer Protection Act, 15 Okla. Stat. § 753 (20), "A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person: 20. Commits an unfair or deceptive trade practice as defined in Section 752 of this title." 25

180.    The Oklahoma Consumer Protection Act, 15 Okla. Stat. § 752 (13) defines a Deceptive Trade Practice as, "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral."

181.    The Oklahoma Consumer Protection Act, 15 Okla. Stat. § 752 (14) defines an Unfair Trade Practice as, "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

182.    The conduct of the Defendants is unconscionable, as a matter of law, because the Defendants knowingly or with reason to know, took advantage of a Ms. Johnson, a consumer reasonably unable to protect her interests because of physical infirmity, ignorance, and inability to understand the language of an agreement or similar fact. 15 Okla. Stat. § 761.1 (B). 26

## CLAIM 5

## Violation of the Oklahoma Residential Landlord and Tenant Act, Okla. Stat. tit. 41, §113.2(B); §118(2)

183.     The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

184.     Defendants violated the Oklahoma Residential Landlord and Tenant Act, Okla. Stat. tit. 41, §113.2(B), by denying Plaintiff's reasonable accommodation request to have two different service dogs that performed different functions for Plaintiff.

185.     Plaintiff's exterior door threshold in her unit does not meet the accessibility guidelines referenced in 42 U.S.C. § 3604(f)(4), despite Woodland Manor being built in 1997.

186.     The Fair Housing Act Amendment of 1988 specified that all multi-family dwellings built after March 13,1991 need to be in compliance with the published accessibility standards regardless of whether or not the occupants have disabilities that necessitate compliance with those standards.

187.     Plaintiff informed Defendants' staff that a wheelchair ramp would repair the threshold design issue, an issue that negatively impacts Plaintiff specifically because her disabilities and burdens Plaintiff's entry into her home.

188.     Plaintiff made requests for this repair numerous times, including once in writing, which all went ignored by Defendants before a sub-par wheelchair ramp was offered to Plaintiff some months later that continues to cause issues for Plaintiff.

189.     Defendants failed to meet their duty required by Okla. Stat. tit. 41, §118(2) to make repairs and maintain Plaintiff's unit in a fit and habitable condition that also complies with required standards set out in the Fair Housing Act Amendment ("FHAA").

## CLAIM 6

### Violation of the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794

190.     The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

191.     The Defendants, as a recipient of federal financial assistance, must follow the Rehabilitation Act of 1973, § 504, to provide qualified disabled individuals an equal opportunity to participate in its housing program.

192.      At all times during her occupancy, and presently, Ms. Johnson qualified and qualifies to participate in the Defendants' federally financially assisted housing program.

193.     The Defendants have denied her an equal opportunity to participate in its federally financially assisted housing program by refusing to grant her requested reasonable accommodation and by retaliating against her for exercising her protected rights.

194.     Under the Rehabilitation Act of 1973, § 504, the Defendants' alleged actions, that were taken because of her disability, constitute unlawful discrimination based on disability in violation of § 504.

## CLAIM 7

### Breach of Contract

195.      The Plaintiff repeats her assertions of facts contained in the paragraphs above as fully set forth herein.

196.     The Defendants' above alleged actions constitute breaches of contract, specifically as it relates to conduct that is prohibited by provisions of Plaintiff's lease with Defendants.

197.     Ms. Johnson has been harmed, as set out above, as a direct result of the Defendants' conduct.

198.     Ms. Johnson is entitled to damages, including a reasonable attorney fees for the prosecution of this case.

## CLAIM 8

### Reverse Veil Piercing

199.     The Plaintiff repleads and herein incorporates all previously asserted facts stated in paragraphs  above as if set forth herein in full.

200.     As pleaded above, the Varia and Stoneweg Defendants are the sole members of the PCWM, LLC.

201.     The Varia and Stoneweg Defendants hold 100% of the equity in Defendant PCWM.

202.     Defendants Varia and Stoneweg capitalized Defendant PCWM with only the subject complex.

203.     The Defendants Varia and Stoneweg sold the only asset belonging to PCWM and divided the proceeds among themselves.

204.     The Defendant PCWM is an undercapitalized entity that has little or no ability to answer for judgments against it.

205.     Defendants Varia and Stoneweg control 100% of the equity and voting for PCWM.

206.     Defendants Varia and Stoneweg retained Defendant Vesta Realty, Bridge Property Management, and RPM Living before to act as their property manager.

207.     This Court must pierce the veil of the limited liability company, Defendant PCWM, to hold the Defendants Varia and Stoneweg liable for the judgment to the extent that Defendant PCWM has insufficient ability to pay.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiff requests:

A.      A judicial determination that Defendants have/has violated the Fair Housing Act;

B.      A judicial determination that the Defendants have violated the Oklahoma Discrimination in Housing Act.

C.      A judicial determination that the Defendants have violated the Oklahoma Anti-Discrimination Act.

D.      A judicial determination that the Defendants have/has violated the Oklahoma Residential Landlord and Tenant Act;

E.      A judicial determination that the Defendants have/has violated the Oklahoma Consumer Protection Act;

F.      A judgment for compensatory damages under the Oklahoma Consumer Protection Act;

G.      A judgment for punitive damages for Plaintiff because of Defendants violations of the Fair Housing Act;

H.      A judicial determination that Defendants have violated the Rehabilitation Act of 1973, § 504, as set forth above;

I.      A Judicial determination that violations have breached the terms incorporated in Plaintiff's lease, as provided for by the HCV program.

J.      A judgment for actual and punitive damages against the Defendants for their violations of  each of the aforementioned Acts.

K.      Statutory damages for violations of the Oklahoma Residential Landlord and Tenant Act;

       L.       Civil penalties for the unconscionable conduct of the Defendants that violates the

Oklahoma Consumer Protection Act;

       M.       Attorney fees and costs of this action; and

       N.       Any other relief to which the Plaintiff is entitled.

Trial by Jury is demanded on all issues.

Dated: September 14, 2023         Respectfully submitted,

                           *Attorney for the Plaintiff,*
                           Ms. Renee Johnson

                           **s/Teressa L. Webster**
                           Teressa L. Webster, OBA No. 30767
                           Attorney for Petitioner
                           Legal Aid Services of Oklahoma, Inc
                           530 Court Street
                           Muskogee, Oklahoma 74401
                           (T) 918-683-5681
                           (F) 918-683-5690
                           (E) Teressa.Webster@laok.org

## CERTIFICATE OF SERVICE

      This is to certify that I served a true and correct copy of the foregoing Second Amended Complaint on all named Defendants via service through this Court's Case Management Electronic Court Filing System.

Date, September 14, 2023                    s/Teressa L. Webster