# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "**Agreement**") is entered into as of the 1st day of August 2019 by and between PC Woodland Manor LLC, a Delaware limited liability company, ("**Owner**"), and BRIDGE PROPERTY MANAGEMENT, L.C., a Utah limited liability company ("**Manager**").

**RECITALS**:

WHEREAS, Owner owns the Woodland Manor Apartments, located in the City of Tulsa, County of Osage, State of Oklahoma (the "**Project**"); and

WHEREAS, Owner desires to engage Manager to manage the Project as property manager.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **Term**. The term of this Agreement (the "**Term**") shall begin as of the date set forth above (the "**Effective Date**"), and continue until the date which is one (1) year after the Effective Date, upon which date, and on the same date of each year thereafter (each, an "**Annual Expiration Date**"), the Term shall be renewed for another year upon the approval of Owner.

2. **Management Responsibility.**

    2.1   Commencing on the Effective Date and continuing throughout the Term, Manager shall have full management responsibility for the operation of the Project and all facilities thereon or associated therewith and shall assume and discharge all responsibilities which accrue during the Term in connection with properly operating and maintaining the Project in accordance with the regulations and standards required of commercial properties comparable to the Project, including, but not limited to:

    (a)   Maintaining the Project and all the facilities thereon or associated therewith and all furniture, furnishings, equipment and other property located therein which needs repair or replacement, in order to maintain standards of operation at least equivalent to those now prevailing, normal wear and tear excepted; using, to the greatest extent feasible, the services of regular maintenance employees;

    (b)   Employment and management of employees, including training and supervising employees in the renting of the dwelling units of the Project and all professional staff requirements, computation and payment of employee taxes, and preparation and filing of the necessary forms for withholding taxes, social security taxes, unemployment insurance, and all other taxes and other forms, federal, state or municipal, relating to the employment of Manager personnel. Persons employed by Manager to perform its duties hereunder shall be employees of Manager, which shall be reimbursed by Owner from Project revenues for the salaries, wages, payroll taxes, and employee benefits of such employees to the

extent that such employees are employed on-site at the Project, and perform no duties for Manager unrelated to the operation of the Project;

    (c)    Processing and payment of all accounts payable;

    (d)    Timely payment of all rents, insurance, taxes, operating costs, etc. before delinquency or penalty;

    (e)    Engaging in marketing activities as directed from time to time by Owner;

    (f)    Purchasing all supplies and other items necessary for the efficient operation of the Project;

    (g)    Complying with all statutes and regulations of governmental authorities and deed restrictions applicable to the operation of the Project and all orders regarding the Project by the Board of Fire Underwriters or other similar bodies;

    (h)    Providing all necessary bookkeeping and accounting for the operation of the Project;

    (i)    Collecting rents and deposits and enforcing the terms of dwelling leases;

    (j)    Owner hereby approves all leases and rental agreements for units in the Project presently in effect. Manager shall use its best efforts to rent all vacant units in the Project. All leases and rental agreements must be approved by the unanimous consent of the Owner. Leases and rental agreements will be deemed approved unless Owner gives written notice of rejection to the Manager within twenty-four (24) hours of receipt. However, all leases and rental agreements that are in strict accordance with the guidelines promulgated by the Owner from time to time and are on a lease agreement form approved by the Owner shall be deemed approved. Attached hereto as <u>Exhibits "A" and "B"</u> are the initial leasing guidelines and form lease agreement approved by the Owner.

    2.2    Notwithstanding the forgoing, Manager will not, without Owner's prior written consent:

    (a)    Incur any capital outlay or expenditure in excess of Five Thousand Dollars ($5,000) or any expenditures of any kind relative to the Project other than as permitted under the Budget;

    (b)    Incur any debt in the name of Owner or the Project; or

    (c)    Dispose of any assets located on or in the Project or encumber the real or personal property comprising or located on the Project, or otherwise suffer or permit any mechanic's or materialmen's liens on the Project.

    2.3    Manager will immediately deposit all funds collected relating to the Project, including security deposits, in such bank accounts as Owner may designate. Owner

from time to time may designate one or more accounts for receipt of funds, for disbursements, for holding of security deposits, and other purposes, all of which shall be established under such terms as Owner may direct in banks approved by Owner. Disbursements from accounts shall be made as Owner may direct from time to time.

   2.4 Manager will not retain any affiliate or subsidiary of Manager to perform any service for the Project without the prior written consent of Owner. If Owner consents to the furnishing of services by an affiliate of Manager, such services shall be furnished at a fair, reasonable and competitive cost.

   2.5 On or before November 1 of each calendar year, Manager shall prepare and submit, at the expense of Manager, to Owner for its consideration and approval a proposed operating budget for the following calendar year (the "Budget"). The Budget shall show in detail all Project receipts and expenditures for the year on a month-by-month cash basis, and shall include allowances for capital expenditures and repairs and contingency reserves for costs overruns. When approved by Owner, Manager shall implement the Budget and shall be authorized, without the need for further approval by Owner, to make the expenditures and incur the obligations provided for in the Budget, up to $5,000. Subsequent to the approval of the Budget for a particular year by Owner, should either Owner or Manager determine that the Budget is not compatible with the then prevailing condition of the Project, Manager shall within thirty (30) days after (i) receipt of notice of such determination by Owner or (ii) such determination by the Manager, prepare and submit to Owner a revised Budget for the balance of the fiscal year, which revised Budget shall be subject to review and approval by Owner in the same manner with the same effect as is the original Budget.

   2.6 <u>LIHTC Compliance</u>. Manager acknowledges the Project was acquired and developed for the purpose of obtaining tax credits and must comply with certain requirements to avoid tax credit recapture and other adverse consequences. Manager represents and warrants that it is familiar with Section 42 of the Internal Revenue Code and the requirements thereto including without limitation (i) the minimum set-aside requirement, (ii) the applicable income restrictions,(iii) the rent restrictions, (iv) the extended use agreement, (v) of any other regulatory agreement, (vi) the requirements in Section 42(g)(2)(D) that the next available unit must be rented to a low-income tenant if income rises above 140 percent of income limit; (vii) rules and regulations regarding qualification for low-income housing tax credits ("Tax Credit") under Section 42 of the Internal Revenue Code, when units are vacant; and (viii) other rules and regulations, including those of the Governing Development and Finance Authority ("Agency") (collectively referred to herein as the "Regulatory Requirements"). Manager agrees to operate the Project in a manner which meets the Regulatory Requirements, including but not limited to the following:

    (a) To cause the apartment units in the Project to be leased to suitable tenants who comply with all regulations regarding eligibility of the Project for the Tax Credits;

    (b) To obtain from all tenants in the Project the right to receive annual reports from such tenants concerning their incomes and family sizes and any other information needed to verify eligibility;

    (c) To execute a lease for any rental unit in respect of which Tax Credit have been allocated to the Owner only upon first obtaining certification from the tenant,

and such other information as may be necessary for the Manager to determine income criteria for low-income housing, that he or she satisfies the income criteria for low-income housing;

(d) To prepare for Owner's signature, and then to file in a proper manner, the annual certifications required by the provisions of law referred to in Code Section 42(g)(4); and

(e) To cause the Project to be operated in a manner that complies with all other statutes, regulations and agreements which must be complied with in order to avoid recapture of any Tax Credits with respect to a mixed-income LIHTC Property.

3. **Payment of Expenses**. All expenses incurred in the operation of the Project which accrue during the Term, including personnel salaries, the cost of supplies and equipment for the Project, taxes and all other items, including but not limited to those listed in Section 2 above, shall be paid by Manager on behalf of Owner from the revenues of the Project.

4. **Manager Compensation**.

4.1 As compensation for the services provided by Manager pursuant to this Agreement, the Owner shall pay, to Manager, a management fee in an amount equal to three percent (3%) of the monthly gross revenues of the Project, which amount shall be calculated for each calendar month and paid to Manager by the fifteenth (15th) day of the following month.

4.2 As the Manager's management fee is calculated as a percentage of the gross revenues of the Project, the same shall include only revenues actually received from tenants at the Project during the applicable monthly accounting period including all gross receipts (but not any sums which, under normal accounting practice, are attributable to capital) derived from the operation of the Project, including, without limitation, all rent, percentage rent and all other sums and charges received from tenants, including amounts actually recovered through litigation for nonpayment of rent (net of the cost incurred in recovering the same), amounts, if any, actually received from lease cancellation fees and parking income, if any, (provided parking operation is not separately contracted to another firm), fees paid for telecommunications, video and/or internet access equipment, utility reimbursements and late charges, but shall not include: any allowance or compensation for any free rent, finish-out allowances or other concessions; any monies paid by tenants (whether or not characterized as rent) for capital expenses, sums collected through litigation for other than nonpayment of rent; security deposits prior to forfeiture thereof; capital improvements; security fees; insurance proceeds; proceeds from sale of assets; fees paid to Manager; fees paid or payable for rooftop and/or antennae equipment, interest earned on funds from time to time on deposits; proceeds from condemnation; and other nonrecurring items.

4.3 If Owner is required to refund to a tenant any amount paid by the tenant, Manager shall promptly pay to Owner, or subtract from the next month's management fee, all management fees originally paid to Manager on the amount of the refund.

4.4 **Tax Credit Compliance Fee ("LIHTC Fee")**. Owner shall pay Manager an LIHTC Fee in the amount of $2.00 per unit per month. The LIHTC Fee covers the cost of the Manager's Compliance Director who will review rental agreements for compliance with the Project's LIHTC Requirements.

4

        4.5    Manager may collect a construction management fee equal to four percent (4%) of rehab costs of major capital projects over $10,000.00. Normal day-to-day repairs such as painting, carpet and appliance replacement are not subject to this fee.

5. **Insurance Requirements**.

        5.1    **Property Insurance**. Owner shall carry property damage insurance, or builder's risk insurance, where applicable, to cover physical loss or damage to the Project from fire and extended coverage perils, including vandalism and malicious mischief and commercial general liability insurance with respect to the Project covering third-party bodily injury, property damage, and personal injury. All such insurance shall be in such amounts and with such insurers as Owner may determine and, with respect to Owner's commercial general liability insurance, shall include Manager as an additional insured thereunder. If requested by Owner, Manager shall obtain such insurance, subject to Owner's approval thereof. Manager shall use its reasonable commercial efforts at all times to comply with all the warranties, terms, and conditions of such insurance. Manager shall notify Owner within 24 hours after the Manager receives notice of any loss, damage, or injury and shall not take any action that might prejudice Owner in their defense to a claim based on such loss, damage, or injury.

        5.2    **Manager Insurance**. Manager shall maintain the following insurance coverage:

| **Insurance** | **Minimum Standards** |
|---|---|
| Workers' Compensation | Coverage A:<br>Minimum limits required by Statute (with proof of compliance as acceptable to Owner)<br>Coverage B:<br>$100,000 Bodily Injury by Accident (Each Accident)<br>$500,000 Bodily Injury by Disease (Policy Limit)<br>$100,000 Bodily Injury by Disease (Each Employee) |
| Non-Occupational Disability Insurance | When required by law |
| Commercial General & Umbrella Liability Insurance | $2,000,000 per occurrence |
| Automobile, Single Limit Bodily Injury and Property Damage including hired and non-owned autos | $1,000,000 per occurrence |
| Fidelity Bond | Greater than two months' gross income from the Property with maximum deductible of $25,000 |
| Crime/Employee Dishonesty/Forgery & Alteration committed by Manager's employees | $1,000,000 per occurrence, $1,000,000 aggregate |

All insurance required hereunder shall be issued by insurers with a Best rating of A-VII or higher and be in force as of the Effective Date, except as specifically set forth in the following sentence.

5

Manager shall furnish Owner, at the time of execution of this Agreement, with copies of policies, certificates of insurance, or other proof evidencing its insurance coverage as required under Section 5.2, together with all exclusions and endorsements; provided, however, that Manager may deliver to Owner, on a date not later than 30 days after the Effective Date, evidence that Owner will be given at least 30 days' prior written notice of cancellation or reduction in coverage. All such policies, except for workers' compensation for Manager's employees directly involved with the operation of the Project shall be at Manager's sole cost and shall name the Owner as an additional insured. In cases where Owner and Manager maintain insurance policies that duplicate coverage, then Owner's policies shall provide primary coverage.

       5.3    **Contractor's and Subcontractor's Insurance**. Unless approved by the Owner, Manager shall require that each contractor and subcontractor hired to perform work at the Project maintain insurance against risk of physical damage to personal property belonging to it in amounts sufficient to replace such personal property in the event of loss, and insurance coverage at such contractor's and subcontractor's expense, in the following minimum amounts:

| **Insurance** | **Minimum Standards** |
|---|---|
| Workers' compensation | As required by law |
| Employer's liability | $500,000 |
| Comprehensive general liability* | $1,000,000 |
| Comprehensive auto liability* | $1,000,000 |

*\*These coverages shall be primary and will respond to any allegation, claim, loss, damage, demand or judgment, or other causes of action arising out of work done at the Project by the contractor or subcontractor on behalf of Owner and Manager. Owner and Manager shall be named as additional insureds on such policies. The policies shall be written on an "an occurrence" basis.*

Owner may require additional coverage if the work to be performed is, in Owner's judgment, sufficiently hazardous. Manager shall obtain not later than 30 days after the date of hiring of each contractor or subcontractor performing work at the Project and keep, on file, policies of insurance, or other evidence of compliance with these requirements. The policies of insurance shall provide at least 30 days' prior written notice of cancellation or any material change in coverage to Manager and Owner. All such policies shall be issued by insurers with a Best rating of A- or higher.

       5.4    **Tenant's Certificates of Insurance**. If tenants' leases require that they maintain any insurance coverage, Manager shall obtain insurance certificates annually from each tenant and review the certificates for compliance with the lease provisions.

       5.5    **Definition of Owner**. For purposes of Sections 5.2, 5.3 and 6, the term "Owner" shall be construed as meaning Owner, and their respective affiliates, members, directors, officers, employees, agents and representatives.

       6.    **Fidelity Bond**. Manager shall procure and maintain throughout the Term, at its own expense, a fidelity bond indemnifying Owner from and against any loss of money or other personal property belonging to Owner, occasioned by any dishonest or fraudulent acts committed on or after the date hereof by Manager, its officers, directors or employees. The bond coverage

shall not be written in an amount less than the maximum amount of funds of Owner over or to which Manager may reasonably be expected to have control or access at any time.

7. **Assignment**. Manager may not assign this Agreement to any other party or parties without the prior written consent of the Owner, and any such assignment will be void. Notwithstanding the foregoing, Manager may subcontract out any of its management duties hereunder, subject to the prior written approval of Owner.

8. **Books, Records and Reporting**. Manager will, on behalf of Owner, keep such accurate and complete files, books, and records pertaining to its performance under this Agreement and such other files, books, and records as Owner may reasonably request, for a period of not less than three years after the date of termination or expiration of this Agreement. Such books and records will include all canceled checks, a separate set of books and records relating to the operation of the Project maintained on a cash basis, and monthly summaries of all accounts receivable and accounts payable. All such files, books, records and checks ("**Records**") will be kept in a secure location and separate from records relating to other purposes. During the Term and during the three-year period following the expiration or termination of the Term, Owner and its respective agents, representatives, employees, or auditors may, at such reasonable times during normal business hours as Owner may determine, inspect, audit, and copy any of the Manager's records, files, reports, and related materials pertaining to the Project or to Manager's performance under this Agreement. Manager shall provide the reports described in the Exhibit "C" as therein provided. If Manager fails to maintain the records in the manner required under this Agreement, or if an audit by an Owner discloses any sum due Owner, Manager will promptly reimburse Owner for any amounts due. If the shortfall variance in the aggregate of amounts due Owner by Manager as shown by an audit exceeds the lesser of 5% of the actual amount due or $2,500, Manager will bear the cost of the audit. Manager shall prepare and timely file 1099 Forms with the Internal Revenue Service, reporting payments to professionals and subcontractors employed on the Project as is appropriate in response to all applicable laws and regulations, as the same may be amended or modified from time to time, and promptly deliver copies of said forms to Owner after the filing thereof if requested by an Owner at any time, Manager shall furnish said forms to Owner for their review and approval before the filing thereof.

9. **Indemnification**. Each party hereby agrees to indemnify and hold the other parties, their employees, agents, servants, subsidiaries and affiliates harmless from any and all damages, claims, costs, losses, and expenses (including reasonable attorneys' fees) arising out of or resulting from the failure of the indemnifying party to perform its duties hereunder, except to the extent caused by the gross negligence or willful misconduct of the other party.

10. **Termination**.

    10.1   This Agreement shall terminate, and all obligations other than those having previously arisen shall cease, upon the happening of any one of the following events:

        (a)   Either party may terminate this Agreement at any time with a thirty (30) day written notice.

        (b)   If any party shall file, or have filed against it, a petition in bankruptcy, or if either shall make a general assignment for the benefit of

creditors, the other parties may terminate this Agreement by serving thirty (30) days written notice on the insolvent party.

   (c) Upon the destruction or upon the taking by any governmental unit through lawful condemnation proceedings of the Project or a substantial portion thereof, any party may terminate this Agreement by serving thirty (30) days written notice on the other parties.

   (d) Upon the consummation of a sale or other disposition of the Project by the Owner.

   (e) The termination or suspension of Manager's property management license or any other license or governmental requirement.

  10.2 Any party may terminate this Agreement at any time for cause.

11. **Miscellaneous.**

  11.1 **Contracts**. During the Term, Manager shall not enter into any written contracts in the name of any Owner or the Project without the express prior written permission of such Owner.

  11.2 **Expenses**. Each of the parties shall pay all costs and expense incurred or to be incurred by it in negotiating and preparing this Agreement.

  11.3 **Notices**. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or after three (3) days if mailed, registered or certified mail, postage prepaid, or any other commercially recognized delivery service, and properly addressed as follows:

|  |  |
|---|---|
| To Manager: | Bridge Property Management, L.C.<br>111 East Sego Lily Drive, Suite 400<br>Salt Lake City, Utah 84070<br>Attention: Mr. Matt DeGraw |
| To Owner: | PC Woodland Manor LLC<br>c/o Stoneweg U.S., LLC<br>360 Central Ave., Suite 1130<br>St. Petersburg, FL 33701<br>Attention: Patrick Richard |
| With a copy to: | Stoneweg U.S., LLC<br>360 Central Ave., Suite 1130<br>St. Petersburg, FL 33701<br>Attention: Brandon Rosser |

or at such other address as the parties may by like notice designate to the others in writing.

8

   11.4 **Applicable Law**. This Agreement shall be construed and enforced in accordance with the laws of the State of the location of the Project.

   11.5 **Counterparts**. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

   11.6 **Effect of Captions**. The captions of paragraphs and subparagraphs of this Agreement have been inserted solely for the purposes of convenience and reference, and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

   11.7 **Assignment**. None of the rights, interests, duties or obligations created by this Agreement may be assigned, transferred, or delegated in whole or in part by Manager, and any such purported assignment, transfer, or delegation shall be void.

   11.8 **Entire Agreement.** This Agreement (including exhibits or signed addenda hereto) contains the entire agreement between Owner and Manager, and no oral statements or prior written matter not specifically incorporated herein shall be of any force and effect. Without limiting the generality of the foregoing, this Agreement supersedes and replaces, effective as of the Effective Date, any previous property management agreement between Owner and Manager with respect to the management of the Project. No variation, modification or changes hereof shall be binding on either party hereto unless set forth in a document executed by such parties or a duly authorized agent, officer, or representative thereof.

   11.9 **No Recordation**. Neither Owner nor Manager shall file or record any instrument or document relative to this Agreement in the public records in any County or State in which any Owner or Manager is doing business or its assets are situated.

   11.10 **Time is of the Essence**. Time is of the essence in all aspects of the performance of the obligations hereunder.

   11.11 **Litigation Costs**. If any legal action or other proceeding of any kind is brought for the enforcement of this Agreement or because of a default, misrepresentation, or any other dispute in connection with any provision of this Agreement or the Project, the successful or prevailing party shall be entitled to recover all fees and other costs incurred in such action or proceeding, in addition to any other relief to which it may be entitled.

   11.12 **Waiver**. No failure by any Owner to insist on the strict performance of any obligation, covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy available upon a breach of this Agreement, shall constitute a waiver, and no breach shall be waived, altered or modified, except by written instrument.

   11.13 **Owner's Representatives; Consents and Approvals**. Owner's consents and approvals may be given only by Owner or their representatives from time to time designated by Owner to Manager in writing. Owner may from time to time designate representatives to approve matters, receive reports, materials, or other items, or otherwise take action on behalf of Owner, and Manager shall cooperate fully with such representatives, to the same extent as if dealing directly with Owner. Any consent or approval required of any Owner under this Agreement shall not be unreasonably withheld, unless the provision requiring such consent or approval specifically states that Owner may withhold such consent or approval in Owner's sole discretion.

11.14  **Confidentiality.** Manager shall keep the terms and conditions of each lease or other Agreement in effect at the Project, together with all information and data obtained, possessed, or generated by Manager in connection therewith (collectively, "Privileged Information") strictly confidential and not make any public announcements or any disclosure to any third parties, with respect to any Privileged Information without the express written consent of Owner; provided the restrictions imposed hereby shall not apply to any Privileged Information required to be disclosed in order to comply with any law or judicial decree, or which must otherwise be disclosed to relevant third parties, including accountants, attorneys, and lenders in the course of reasonable and diligent management of the Project. The provisions of this Section shall survive the expiration or termination of this Agreement.

11.15  **Limitation of Owner's Liability.** Owner and Manager agree that, notwithstanding any other provision of this Agreement or any rights which Manager might otherwise have at law, equity, or by statute, whether based on contract or some other claim, any liability of any Owner to Manager shall be satisfied only from such Owner's interest in the Project and the proceeds thereof. Without limiting the generality of the foregoing, if an Owner is or becomes a partnership, the general or limited partners, employees, agents, or affiliates of such Owner shall not in any manner be personally or individually liable for the obligations of such Owner hereunder or for any claims related to this Agreement or the operation of the Project. If an Owner is or becomes a corporation, no officer, employee, agents, or affiliates of such Owner shall in any manner be personally or individually liable for the obligations of such Owner hereunder or for any claim in any way related to this Agreement or the operations of the Project.

11.16  **No Sales Brokerage Agreement.** There are no sales brokerage agreements between Owner and Manager. Manager has no brokerage agreement, obligation or understanding (exclusive or otherwise) with respect to the sale of all or any part of the Project (or any interest therein) on behalf of Owner. In the event an Owner effects a sale of all or any part of the Project, whether on its own or through the use of brokers or others, Manager shall not be entitled to any fee, commission or other compensation on account of such sale unless Manager is specifically engaged by Owner as a broker pursuant to a written agreement between the parties.

11.17  **Subordination.** Berkadia Commercial Mortgage LLC, ("**Lender**"), is about to make or has made a loan to Owner (the "**Loan**"). Such Loan is or shall be evidenced in part by a Promissory Note and will be secured by a Deed of Trust and Security Agreement (the "**Security Instrument**") that encumbers the Project. Notwithstanding anything to the contrary contained herein, Manager agrees that any fees payable to the Manager pursuant to this Agreement in excess of the management fee provided for in Section 4.1 are and shall be subordinated in right of payment to the prior payment of amounts due and payable under the Loan (as defined in the Security Instrument). Manager consents and agrees that with the closing of the Loan that it will execute and deliver to Lender an Assignment of Management Agreement and Subordination of Management Fees, with one or more riders that provide in substance for subordination of management fees in certain circumstances (collectively the "**Assignment**") in the form required by the Lender. In the event Manager fails or refuses to execute and deliver such Assignment with the closing of the Loan, Owners may immediately terminate this Agreement for cause.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

**MANAGER:**        **BRIDGE PROPERTY MANAGEMENT, L.C.**,
a Utah limited liability company

By: _____
Name: Thomas A. Potvien
Title: Director of Business Development

**OWNER:**        **PC WOODLAND MANOR**, LLC, a Delaware limited liability company

By its Manager: Stoneweg U.S., LLC, a Florida limited liability company

By: _____
Name: Patrick Richard
Its: Manager

# EXHIBIT "A"

## LEASING GUIDELINES



**BRIDGE**
PROPERTY MANAGEMENT

### Resident Qualifying Criteria

We are committed to complying with all fair housing laws, which prohibit discrimination based on race, color, religion, sex, national origin, age, military background or service, martial or familial status, or handicap, or any other consideration made unlawful by federal, state or local laws. Below briefly explains part of the process that we utilize in determining the eligibility of each applicant, including minimum requirements.

- **Income** — Monthly income must be a minimum of three (3) times the monthly rental amount or such other amount as determined by Owner and Manager.

- **Employment** — Employment must be verifiable for a minimum of one-year.

- **Responsible Parties** — All persons in the household 18 years and older must fill out an application, be approved and sign the lease as a responsible party.

- **Credit History** — A credit report will be obtained for all applicants. Negative credit Information will be reviewed as to age of accounts, account type and extensiveness of outstanding negative debt. Additional deposit and/or co-signer may be required.

- **Criminal History** — If a court conviction for any of the following is found, it will be grounds for denial of this application. This list includes but is not limited to: Felony conviction, theft, alcohol related conviction, any type of sexual misconduct, outstanding warrant, disorderly conduct, assault or battery conviction.

- **Rental History** — A positive rental or mortgage payment history for a minimum of one year is required. Evictions, delinquent rental payments, outstanding balance due with a prior rental and/or failure to fulfill terms of prior lease are grounds for denial.

- **Occupancy Standards** — Occupancy limits are stated as 2 persons per bedroom plus 1 more per dwelling. Thus, a one-bedroom apartment may have a maximum of three (3) occupants; a two-bedroom may have a maximum of five (5) occupants.

- **I.D. Verification** — A copy of your driver's license or state I.D. will be taken.

## EXHIBIT "B"

## FORM LEASE AGREEMENT

Blue Moon National Apartment Association Lease Form

# EXHIBIT "C"

## REPORTING REQUIREMENTS

On or before the fifteenth (15th) day each calendar month during the Term, Manager shall deliver to Owner two (2) copies of the following statements pertaining to the Project for and through the previous month to the extent such reports are applicable to the given month, prepared on a modified cash basis:

(1) Management Letter and Narrative Report;
(2) Financial Statements including Balance Sheet; Profit and Loss Statement; Detailed General Ledger; Check Register; and 12 Month Rolling Income and Expense Statement [TO BE DELIVERED BY THE 10TH DAY OF EACH CALENDAR MONTH];
(3) Income and Expense Recap and Comparison to Budget with Detailed Budget Variance Explanations--Monthly and Year-to-Date;
(4) Bank Account(s) Statement(s) and Reconciliation(s) [TO BE DELIVERED BY THE 10TH DAY OF EACH CALENDAR MONTH];
(5) Detailed Rent Roll--including vacant spaces and units;
(6) Aged Delinquencies Report;
(7) Month-to-Date Tenant Summary (Income Report);
(8) Marketing Recap (Ad Copies and Flyers);
(9) Lease Prospect Report;
(10) Property Inspection Report (Quarterly);
(11) Incident Report;
(12) Leasing and Occupancy Report;
(13) Leasing Activity Report;
(14) Comparable Market Report (Quarterly);
(15) Personal Property Inventory Update (Quarterly);
(16) Unit Inventory Status;
(17) Employee Recap and Office/Management/Storage Recap,
(18) Rental Rate Recap; and
(19) Traffic/Leasing Recap.

Please submit the following reports in the initial month of reporting only:

(1) Budget;
(2) Lease Abstracts;
(3) Personal Property Report; and
(4) Property Inspection Report.

One (1) set of reports shall be delivered to Owner. Such monthly statements shall be in a form satisfactory to Owner. Owner may amend their accounting and reporting requirements at any time during the Term.

\*\*\*In the event the delivery date referenced above (i.e., 10th or 15th of the month) falls on a weekend or Federal holiday, such delivery date shall be extended to the following business day.