

# Management Agreement

EXHIBIT 2

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is effective as of November 19, 2021 or the date of closing and acquisition of the property, whichever is earlier, by and between PC Woodland Manor LLC, a Delaware limited liability company ("Owner") and RPM Living, LLC, a Texas limited liability company ("Manager").

WHEREAS, Owner is the fee owner of that certain apartment community known as Woodland Manor located at 8641 E. 61st Street, Tulsa, Oklahoma 74133 ("Property"), and desires the Manager to manage, maintain, service and operate the same as an independent contractor.

WHEREAS, Manager desires to accept and assume the foregoing responsibilities in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises contained herein and other good and valuable consideration the receipt of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I

## COMMENCEMENT DATE

1.1 The Manager's duties and responsibilities under this Agreement shall begin upon the full execution and delivery of this Agreement and shall continue until termination as provided in Article X.

## ARTICLE II

## MANAGER'S RESPONSIBILITIES

2.1 <u>Management</u>. The Manager shall manage, operate, service and maintain the Property in an efficient and effective manner, and in accordance with the standard of management for comparable apartment communities in the metropolitan area where the Property is located, subject to the operating and financial parameters set forth herein. In this capacity, Manager shall deal at arm's length with all third parties and Manager shall act in the best interests of the Property. Notwithstanding anything contained herein to the contrary, Manager shall screen and vet each third party retained by Manager pursuant to this Agreement, including but not limited third parties retained in connection with Sections 2.6 and 2.7 below, based upon the criteria and parameters provided to Manager by Owner.

2.2 <u>Authorized Representative.</u> Owner shall provide direction to the Manager in connection with the Manager's performance of its duties under this Management Agreement. No person or entity other than those authorized by Owner or Manager shall have the right to enter or inspect the Property. Neither Owner nor its agents shall have any communications with any third parties retained by Manager to perform services on the Property, unless accompanied by a representative of the Manager.

2.3 <u>Employees' Independent Contractor.</u>  The Manager shall hire, discharge, supervise and pay all workers or contractors considered by the Manager as reasonably necessary for the efficient and effective management of the Property; provided, however, that no such workers or contractors shall be hired as employees of Owner.  Any such workers or contractors which are hired as employees shall be hired as employees of the Manager and the Manager shall be responsible for workers' compensation insurance and fulfilling all other obligations of an employer.  All reasonable cost(s) associated with the hiring of on-site employees incurred by Manager will be reimbursed by Owner in accordance with Section 7.1.

2.4 <u>Approved Budgets</u>. Manager shall prepare a proposed Operating Budget and a proposed Capital Budget for the promotion, operation, repair and maintenance of the Property for the forthcoming 12-month period.  Each proposed Budget shall be delivered to Owner no later than 30 days after the execution of this Agreement or takeover date, whichever is later, and each subsequent proposed budget shall be delivered at the beginning of each fiscal year.

Owner will consider the proposed budgets and then will consult with Manager at the commencement of the forthcoming calendar year in order to agree on an "Approved Operating Budget" and an "Approved Capital Budget".

During the calendar year the Manager shall inform Owner of any major increase or increases in costs and expenses that were not foreseen during the budget preparation period and thus were not reflected in either Approved Budget.

2.5 <u>Collection of Rents and Other Income</u>. Manager shall use diligent efforts to collect all rents, security deposits, tenants' pro-rata share of operating expenses and other charges, which may become due at any time from any tenant or from others for services provided in connection with or for the use of the Property or any portion thereof.  Manager shall collect income from miscellaneous services provided to tenants or the public including, but not limited to parking income, tenant storage, and coin operated machines of all types.  All monies so collected shall be deposited in the Operating Account.  Manager shall have the authority to terminate any lease, institute suit for rent or for use and occupancy, or proceedings for recovery of possession, and in connection with any collection efforts, retain such legal counsel or collection firm as Manager elects.  Owner hereby grants to any officer or employee of Manager the right to appear in eviction and conciliation court actions on its behalf.  All legal expenses incurred in bringing such suit or proceeding shall be paid out of the Operating Account.

2.6 <u>Repairs</u>.  The Manager shall attend to the making and supervision of all ordinary and extraordinary repairs that Manager deems appropriate, and are within the approved budget, or approved by Owner in accordance with Section 7.2.

2.7 <u>Service Contracts.</u>   Manager shall enter into such contracts for cleaning, maintaining, repairing, or servicing the Property or any of the constituent parts of the Property as Manager deems appropriate, the cost of which to be reimbursed by Owner in accordance with Section 7.2. Such contracts shall be

(1) Subject to prior written approval by Owner or,

(2) Cancelable with 30 days' or less notice, and

(3) Not with a party related to affiliated with Manager unless such relationship or affiliation is disclosed to Owner in advance and Owner's written consent is given thereafter.

2.8   <u>Compliance</u>. The Manager does not assume and is given no responsibility for compliance of any building on the Property or any equipment therein with the requirements of any statute, ordinance, law, or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to promptly notify the Owner and to promptly forward to the Owner any complaints, warnings, notices, or summonses received by Manager relating to such matters.   The Owner represents that to the best of its knowledge the Property and such equipment comply with all such requirements and authorizes the Manager to disclose the ownership of the Property to any such officials and agrees to indemnify and hold harmless the Manager, its representatives, and employees from all loss, cost, expense, and liability whatsoever which may be imposed on them or any of them by reason of any present or future violation or alleged violation of such laws, ordinances, statutes, or regulations.

2.9   <u>Cancellation upon Non-Compliance</u>. In the event it is alleged or charged that any building on the Property or any equipment therein or any act or failure to act by the Owner with respect to the Property or the sale, rental, or other disposition thereof fails to comply with, or is in violation of any of the requirements of any constitutional provision, statute, ordinance, law or regulation of any governmental body or any order or ruling of any public authority or official thereof having or claiming to have jurisdiction there over, and the Manager, in its sole and absolute discretion, considers that the action or position of the Owner or registered managing agent with respect thereto may result in damage or liability to the Manager, the Manager shall have the right to cancel this Agreement at any time by written notice to the Owner of its election to do so, which cancellation shall be effective upon the service of such notice.   Such notice may be served personally or by registered mail, on or to the person named to receive the Manager's monthly statement at the address designated for such person as provided in Paragraph 2.2 above, and if served by mail shall be deemed to have been served when deposited in the mails.   Such cancellation shall not release the indemnities of the Owner set forth in Paragraphs 2.8 and 7.1 and shall not terminate any liability or obligation of the Owner to the Manager for any payment, reimbursement or other sum of money then due and payable to the Manager hereunder.

2.10   <u>Property Incidents</u>.   Manager shall promptly notify Owner in writing of (i) any material criminal activity observed or discovered by Manager at the Property, and (ii) any material loss, damage, or injury, which occurs at the Property which Manager discovers or becomes aware of. Manager shall not be responsible for the processing or settlement of any insurance claims against Owner's insurers, but Manager shall reasonably assist Owner with processing said claims upon Owner's request.

ARTICLE III

INSURANCE

3.1 <u>Owner's Insurance</u>.   Manager shall furnish whatever information that is requested by Owner for the purpose of establishing the placement of insurance coverage and shall aid and cooperate in every reasonable way with respect to such insurance and any loss thereunder.  Owner shall obtain and maintain in force throughout the term of this Agreement both property and liability insurance covering the Property, naming Manager as additional insured and shall provide evidence of the same prior to contract commencement date. Owner's liability insurance coverage, including any excess coverage for Owner, shall be primary coverage for liabilities of Owner and Manager.  The property insurance policy shall include a waiver of subrogation rights endorsement for the benefit of Manager. Owner shall provide Manager Certificates of Owner's insurance policies.

3.2 <u>Manager's Insurance</u>.   During the pendency of this Agreement, Manager shall maintain the following insurance policies and coverages:

(1) <u>Workers' Compensation Policy:</u> to provide statutory coverage including Employers Liability in the following minimum amounts:  $1,000,000 Each Accident, $1,000,000 Each Employee, $1,000,000 Policy Limit.  The cost of such insurance as it pertains to employees used on the Property to be reimbursed by Owner in accordance with Section 7.1.

Workers' compensation coverage shall include a waiver of subrogation in favor of Owner, and Owner's Manager, Stoneweg U.S. LLC

(2) <u>Automobile liability</u><b>:</b> Coverage with a combined single limit of liability of not less than One Million Dollars ($1,000,000) covering all owned, non-owned and hired vehicles used in connection with the Property.  Owner, and Owner's Manager, Stoneweg U.S. LLC, shall be named as an additional insured

(3) <u>Commercial general liability insurance (occurrence form)</u><b>:</b>   Coverage with limits of not less than One Million Dollars ($1,000,000) for each occurrence and general aggregate limits of not less than Two Million Dollars ($2,000,000) per location. Owner, and Owner's Manager, Stoneweg U.S. LLC, shall be named as an additional insured endorsements CG2010 1185 or its equivalent

(4) <u>Umbrella liability:</u> Coverage with a minimum limit of Five Million Dollars ($5,000,000) in excess over the above underlying policies including Commercial General Liability, Automobile Liability and Employers Liability.  Owner, and Owner's Manager, Stoneweg U.S. LLC, shall be named as an Additional Insured.

(5) <u>Professional liability insurance:</u> Coverage with limits no less than $1,000,000 aggregate covering errors and omissions of Manager related to all aspects of Manager's duties contained in this Agreement

(6) <u>Crime Insurance:</u> coverage with a limit of $1,000,000 minimum for losses arising from the dishonest acts, theft, embezzlement, fraud including 3rd party coverage for those locations managed by Manager on Owner's behalf. Coverage shall include a joint payee endorsement in favor of Owner, and Owner's Manager, Stoneweg U.S. LLC

All insurance required pursuant to this Section 3.2 shall be written by an insurance company or companies reasonably satisfactory to Owner and licensed or authorized to do business in the state in which the Property is located. Each insurer will have an A.M. Best rating of an A-VIII or higher. All insurance policies required herein shall contain endorsements that confirm that said insurance policies shall not be cancelled, not renewed, or materially changed except upon thirty (30) days prior written notice to Owner.

Manager will provide evidence of all insurance coverages referenced above to Owner, and Owner's lenders or investors, upon request. Prior to Manager's performance of services under this Agreement, certificates of insurance reasonably acceptable to Owner shall be filed with Owner. Enclosed with the certificates of insurance, Manager shall include copies of: (1) the additional insured endorsements providing coverage as required by this Agreement; (2) the waiver of subrogation endorsements as respect to workers' compensation coverage.

3.3 <u>Subcontractor's Insurance.</u>  Manager will require that each subcontractor engaged with respect to the Property procure and maintain throughout the engagement insurance coverage at the subcontractor's expense covering such risks and for such amounts as Manager deems appropriate. Manager will require that each subcontractor furnish Manager with a valid certificate of insurance confirming the appropriate insurance coverage(s) prior to subcontractor's performance of services at the Property.

3.4 <u>Liability & Indemnification</u>.  Except in the event of Manager's gross negligence or willful misconduct, Manager is not responsible or liable in any manner for personal injury or for loss or damage to any person's real or personal property resulting from any act or omission including but not limited to injuries or damages caused by:

(1) Acts of third parties such as vandalism, theft, or other criminal acts;

(2) Mechanical malfunctions;

(3) A dangerous condition or environmental condition on the Property; or

(4) The Property's non-compliance with any law or ordinance

Except in the event of Manager's gross negligence or willful misconduct, Manager is not responsible or liable in any manner for:

(1) Any late fees or other charges Owner incurs to any creditor caused by late or insufficient payments by any tenant in the Property;

(2) Damages to Owner caused by a tenant's breach of a lease; or

(3) Owner's failure to provide sufficient operating funds for the Property

Except in the event of Manager's gross negligence or willful misconduct, Owner agrees to protect, defend, indemnify, and hold Manager harmless from any damage, costs, attorney's fees, and expenses that are related to the management of the Property.

Except in the event of Manager's gross negligence or willful misconduct, Owner is responsible and liable for all contracts and obligations related to the Property entered into before or during this agreement by Owner or Manager under Manager's authority under this agreement. Owner agrees to hold Manager harmless from all claims related to any such contracts.

Manager shall indemnify, defend and hold harmless Owner together with Owner's Manager, Stoneweg U.S. LLC, from and against any and all claims, causes of action, suits, proceedings, demands, losses, damages, liabilities, costs and expenses (including reasonable attorney's fees) arising out of resulting from Manager's gross negligence or willful misconduct during its performance of services under this Agreement.

The provisions of this Section 3.4 shall survive the expiration or termination of this Agreement.

ARTICLE IV

FINANCIAL REPORTING AND RECORD KEEPING

4.1 Books of Account.   Manager shall maintain adequate and separate books and records for the Property, the entries to which shall be properly and accurately recorded to the Property.   Such books and records shall be maintained by Manager at Manager's address stated in Section 11.1 or at such other location as may be mutually agreed upon in writing.

4.2 Financial Reports.   The Manager shall furnish Owner with reports of all transactions occurring during the preceding month after the end of each month.   These reports will show all collections, delinquencies, uncollectible items, vacancies and other matters pertaining to the management, operation, and maintenance of the Property during the preceding month.   Specifically, Manager shall provide Owner with the reports, materials and documentation set forth on the attached Exhibit "A", consistent with the timelines listed therein.

4.3 Supporting Documentation.   As additional support to the monthly financial statement, Manager shall provide, as requested, copies of the following:

(1) Current rent roll.

(2) General ledger listing;

(3) Bank statements and reconciliations; and

(4) Such other documentation as Owner reasonably requests

4.4 Asset Management Reports.   The Manager shall prepare and deliver to Owner the asset management reports and other documents (collectively, the "AM Reports") set forth on the attached Exhibit "B", consistent with the time period(s) and other criteria set forth thereon.   The AM Reports shall be prepared and delivered to Owner in electronic format unless otherwise specified by Owner in writing.

## ARTICLE V

## RIGHT TO AUDIT

5.1 <u>Right to Audit</u>.   Owner, at Owner's expense, reserves the right to conduct examinations and to make copies of the books and records maintained by Manager. Owner also reserves the right to perform any and all additional audit tests relating to Manager's activities either at the Property or at any office of the Manager; provided such audit tests are related to those activities performed by Manager with respect to the Property.

Should Owner's employees or appointees discover either weaknesses in internal control or errors in record keeping, Manager shall correct such discrepancies either upon discovery or within a reasonable period of time.

## ARTICLE VI

## BANK ACCOUNTS

6.1 <u>Operating Account</u>.   The Manager shall deposit all rents and other funds collected from the operation of the Property, including any and all advance rents and security deposits, in a specially designated account, the "Operating Account" for the Property.   Unless otherwise directed by Owner in writing, Manager shall establish the Operating Account in the name of the Owner at a financial institution selected by Owner.   Owner, in addition to Manager, shall be an authorized signatory to such account unless prohibited by applicable law.   Out of the account, Manager shall pay the operating expenses of the Property and any other payments relative to the Property as required by the terms of this Agreement. Owner will maintain at all times and replenish when necessary a prudent reserve of no less than $15,000.

## ARTICLE VII

## PAYMENTS OF EXPENSES

7.1 <u>Manager's Costs to be Reimbursed.</u>   Manager shall be reimbursed out of the Operating Account for costs of the gross salary and wages or pro-rata share thereof, payroll taxes, insurance, worker's compensation and other benefits or other costs of all on-site personnel employed by Manager and required in Manager's discretion to properly, adequately, safely and economically manage, operate and maintain the Property.

7.2 <u>Costs Eligible for Payment from Operating Account.</u> Except as expressly provided otherwise in this Agreement, Manager must pay the following expenses directly from the Operating Account. Expenses incurred by or on behalf of the Property prior to the commencement date of this Management Agreement are ineligible to be paid from the Operating Account and are the sole responsibility of the Owner.

(1) Cost of correcting any violation of federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, repair and maintenance of the Property, or relative to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body;

(2) Cost of making all repairs and performing maintenance;

(3) Cost of collection of delinquent rentals collected through any collection agency;

(4) Legal fees of attorneys retained by Manager in connection with the Property;

(5) Cost of capital expenditures subject to the restrictions in Section 9.2;

(6) Cost of forms, papers, supplies, postage, equipment, and checks applicable to the Property;

(7) Leasing commissions paid to third parties.

(8) Cost of service contracts.

(9) Cost of advertising and marketing.

(10) The compensation to Manager as specified in Article 9.1.

(11) Cost of license fees to operate on-site property management software.

7.3 <u>Non-reimbursable Costs.</u>   The following expenses or costs incurred by or on behalf of the Manager in connection with the management and leasing of the Property shall be at the sole cost and expense of Manager and shall not be reimbursement by Owner:

(1) Cost of gross salary and wages, payroll taxes, insurance, workers compensation, and other benefits of Manager's personnel not specified in Section 7.1;

(2) General accounting and reporting services which are considered to be within the reasonable scope of the Manager's responsibilities;

(3) Cost of electronic data processing equipment, or any pro-rata charge thereon, located off the Property; unless such equipment is used by the off-site property manager assigned to the Property, and

(4) Cost of electronic data processing, or any pro-rata charge thereof, for data processing provided by computer service companies located off the Property; unless such services are for equipment used by the off-site property manager assigned to the Property, and

(5) Political or charitable contributions.

## ARTICLE VIII

## COOPERATION

8.1 Cooperation.   Should any claims, demands, suits or other legal proceedings be made or instituted by any person or entity against Owner which arise out of any of the matters relating to this Agreement, Manager shall promptly provide Owner with all pertinent information, including any and all notices or other related materials, and reasonably assist and cooperate in the defense or other disposition thereof.

## ARTICLE IX

## COMPENSATION

9.1 Management. The Manager shall receive remuneration for its services in the amount of three percent (3.0%) of total income or a minimum fee of $6,000, whichever is greater; computed and paid monthly.

9.2 Capital Improvements.   If the Manager is required to oversee capital improvement projects, the compensation for which is not customarily included in a property manager's fee, additional compensation shall be fixed in an amount agreed upon in advance between the parties, and if there has been no such agreement, said additional compensation shall be five percent (5%) of the total cost of the service or construction.   Notwithstanding anything contained herein to the contrary, the terms and conditions of this Section shall only apply to those projects which exceed $25,000 in cost, and are either within the applicable budget or approved by Owner in writing in advance.

9.3 Termination Fee.   In the event Owner terminates this Agreement without cause within twelve (12) months after the execution date, Owner shall pay Manager upon such termination a fee equal to the last month's management fee times the number of months remaining of the twelve (12) month term, in addition to all other sums due hereunder.   No termination fee shall be due or payable (i) for a termination by Owner that is effective at any time after twelve (12) months after the execution date, or (ii) in the event that Owner sells the Property within twelve (12) months after this Agreement is executed.

9.4 Compliance Fee.   Manager will receive a fee equal to $3.00 per apartment unit for monitoring compliance to resident income qualifications for any period under which compliance monitoring is required.

## ARTICLE X

## TERMINATION

10.1 Termination by Manager.   Manager shall have the right to terminate this Agreement for any

reason by giving Owner 60 day's prior written notice.

      10.2 <u>Termination by Owner</u>.  Owner shall have the right to terminate this Agreement for any reason, or for no reason, by giving Manager 30 day's prior written notice and payment of all fees and reimbursements attributable to the Property through the date of termination.

      10.3 <u>Termination on Sale.</u>  This Agreement shall terminate automatically and immediately as to the Property upon the sale of the Property. However, (i) Owner shall remain liable to Manager for all fees, reimbursements and other costs attributable to the Property through the date of sale, and (ii) Manager shall perform any and all reasonable actions and activities requested by Owner prior to and after the date of sale for a period not to exceed ninety (90) days in order to turn over the Property to Owner's successor-in-interest.

      10.4 <u>Final Accounting</u>.  Upon termination of this Agreement for any reason Manager shall deliver to Owner the following with respect to the Property:

    (1) A final accounting, reflecting the balance of income and expenses on the Property as of the date of termination or withdrawal to be delivered within thirty (30) days after such termination; and

    (2) Any balance of monies held by Manager for Owner with respect to the Property to be delivered immediately upon such termination.

      10.5 Manager's Master Insurance Program.  Any voluntary participation in Manager's Master Insurance Program will terminate immediately effective the termination date, without notice.

ARTICLE XI

NOTICES

      11.1 <u>Notices</u>.  All notices, demands, consents and reports provided for in this Agreement shall be in writing and shall be given to Owner or Manager at the address set forth below or at such other address as they individually may specify thereafter in writing:

    OWNER:   PC Woodland Manor LLC
                     C/O Stoneweg U.S. LLC
                     360 Central Avenue
                     Suite 1130
                     St. Petersburg, FL 33701
                     Attn: Sam Palmer
                     Email: sam.palmer@stoneweg.com

    MANAGER:   RPM Living, LLC
                       ATTN: Jason Berkowitz
                       5508 Parkcrest Drive #320
                       Austin, TX 78731

Email:_jason.berkowitz@rpmliving.com

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid and deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the Post Office. Such notices, demands, consents and reports may also be delivered by hand, via email, or by any other method or means permitted by law. For purposes of this Agreement notices will be deemed to have been "given" upon actual delivery thereof or 48 hours after having been deposited in the United States mails as provided above.

## ARTICLE XII.

## GENERAL

12.1 <u>No Assignment</u>. Except as specifically provided for herein, this Agreement and all rights hereunder, shall not be assignable by either party hereto. Owner may assign its rights, title and interest in and to this Agreement to an affiliated or related entity, and/or an entity that is under common ownership, without Manager's consent. Provided such assignment occurs, Owner shall provide Manager with written notice of such assignment promptly following the effectuation of such assignment.

12.2 <u>Pronouns</u>. The pronouns used in this Agreement referring to the Manager shall be understood and construed to apply whether the Manager is an individual, co-partnership, corporation or an individual or individuals doing business under a firm or trade name.

12.3 <u>Amendments; Entire Agreement</u>. Except as otherwise herein provided, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by the parties in writing. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements, understandings, representations and covenants

12.4 <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.5 <u>Representation</u>. Manager represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage and lease real estate and perform all obligations assumed by Manager hereunder. Manager agrees to comply with all such laws now or hereafter in effect.

12.6 <u>Governing Law</u>. This Agreement shall be governed by the laws of the State in which the Property is located without reference to such State's principles of conflict of law to the extent such principles would require or permit the application of the laws of another jurisdiction.

12.7 <u>Venue</u>. All proceedings arising out of this Agreement shall be brought in a court of competent jurisdiction in the county/city where the Property is located. The parties irrevocably and unconditionally waive any objection to venue of any suit, action, or proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

12.8 <u>Attorney's Fees</u>. In the event that either party institutes legal proceedings against the other in order to interpret or enforce any term, provision or condition of this Agreement, the prevailing party in such proceeding (through trial and appeal) shall be entitled to recover its reasonable attorney's fees and costs from the non-prevailing party.

12.9 <u>Waiver</u>.  No consent or waiver, express or implied, by either party to or of any breach or default by the other party in the performance of its obligations hereunder, shall be valid unless in writing and signed by the party against whom such waiver is sought to be enforced. No such consent or waiver shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of any other obligations of such party hereunder. The failure of any party to declare the other party in default shall not constitute a waiver by such party of its rights hereunder, regardless of how long such failure continues. The granting of any consent or approval in any one instance by or on behalf of Owner shall not be construed to waive or limit the need for such consent in any other or subsequent instance.

12.10. <u>Severability</u>.  Each provision of this Agreement is intended to be severable. If any term or provision hereof or the application thereof to any party or circumstance shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, such term, provision or application thereof shall be severed from this Agreement and shall not affect the validity of the remainder of this Agreement or the application of such term or provision to any other party or circumstance.

12.11. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

***[SIGNATURES TO FOLLOW]***

SIGNATURE PAGE TO MANAGEMENT AGREEMENT

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date and year first below written.

**OWNER:**

**PC Woodland Manor LLC**

    By: Stoneweg U.S. LLC
    Its: Manager

    By: _____

    Print Name: Sam Palmer

    Title: EVP of Asset Management

    Date: October 25, 2021

**MANAGER:**

**RPM Living, LLC**

By: _____

Print Name: Angelique Goodnough

Title: President

Date: October 20, 2021

### EXHIBIT "A"

### MONTHLY REPORTS

To be provided to Owner by end of day **Business Day* 5** following a **month's** end (all in Owner's predetermined account tree/Chart of Accounts), these represent the preliminary reports to be reviewed and approved by the Owner

1. Yardi Report - Budget Comparison – MTD, QTD and YTD on same report
2. Yardi Report - General Ledger (Detailed) – MTD
3. Yardi Report – AP Aging Report
4. Yardi Report – AR Aging Report
5. Yardi Report – T-12 Income Statement – Trailing 12 months
6. Manual Report – GC Fee Calculation – Calculation detailing General Contractor fee incurred in the financial statements (listing projects associated with fee)
7. Manual Report - Property Management Fee Calculation - Schedule detailing monthly charge
8. Yardi Report – Preliminary Monthly ETL file

To be provided by end of day **Business Day* 8** following a **month's** end (all in Owner's predetermined account tree/Chart of Accounts, after Asset Management Approval) *After delivery of the below, the accounting period should be closed and there should be no adjustments made unless explicitly approved by Owner's Accounting Department*

1. Yardi Report - Budget Comparison – MTD, QTD and YTD on same report
2. Yardi Report – T-12 Income Statement – Trailing 12 months
3. Yardi Report - Trial Balance - MTD
4. Yardi Report - General Ledger (Detailed) - MTD
5. Yardi Report - General Ledger (Detailed) - YTD
6. Yardi Report - Rent Roll with Lease Charges - As of previous Month's End
7. Yardi Report - Monthly ETL File
8. Manual Report - Balance Sheet Reconciliation (detailing/reconciling all items on balance sheet)- As of Month End
9. Manual Report – Bank Reconciliations for all bank accounts
10. Manual Report – Monthly Excess Cash or Forecast cash flow analysis

To be provided by end of day **Business Day* 11** following a **month's** end (all in Owner's predetermined account tree/Chart of Accounts, after Owner's Asset Management Approval)

1. Manual Report - Flux Analysis - Detailed explanation of all monthly budget variances (by subcategory IE Contract services, physical vacancy, other income etc) larger than $5,000
2. Manual Report – Aged Tenant Receivable Analysis - Gross AR report detailing which tenants are allowed for and the status of each tenant on the report (IE if in collections, last collection attempt, whether tenants are on installment plans etc). Analysis should reconcile back to tenant receivables/allowance on the prior month balance sheet
3. Yardi Report - GPR Report - Reconciled to prior month income statement
4. Manual Report - Bank/Escrow Reconciliation - Schedules detailing reconciliation to all bank accounts/escrow accounts. For self escrows, schedule should detail calculation
5. Manual Report -Equity Rollforward - Schedule detailing equity transactions for the year (income, contributions and distributions). All should be reconciled to monthly financials
6. Manual Report - Allocation of Fees Calculation(s) - Schedule detailing all expenses charged/allocated to the properties from the Manager other than 3rd party invoices

7. Manual Report – Capex Reconciliation – Schedule reconciling capex per the financial statements to listing of projects detailing project/ unit rehab status as well as commentary on whether project is over/under budget and rent growth related to unit rehabs
8. Manual Report – Market Study Comparison – Schedule comparing market rents charged (in Yardi) to comparable properties in the area

To be provided by end of day **Business Day\* 14** following a **quarter's** end (all in Owner's predetermined account tree/Chart of Accounts, after Asset Management Approval)

1. Manual Report - Quarterly Lender Reimbursement - T-3 P&L schedule with column next to each GL labeled "To be submitted for Lender Reimbursement" detailing of the amounts on the financial, how much was submitted to lender for reimbursement. Criteria for lender reimbursement should be abstracted in this document

2. Manual Report - Insurance Analysis (for properties in receipt of funds from insurance companies for repairs) - Schedule detailing all funds received from insurance companies, all invoices for repairs to date. The analysis should reconcile to the insurance liability/receivable and include commentary regarding estimated date of completion, any overages etc.

3. Manual Report – Renter's Liability Insurance (for properties that do not have 100% coverage) – Schedule showing total units and the percentage of units with Renter's Liability Insurance and without

# EXHIBIT "B"

## ASSET MANAGEMENT REPORTS

<u>WEEKLY REPORTS</u>

1. Weekly Property Update – A snapshot of the prior week's activity to be delivered every Monday by noon.
    a. Manual Report – Stoneweg Manual Activity Report
    b. Yardi Report - Unit Availability with Details Report – live report
    c. Yardi Report - Box Score Summary – pulled from prior Monday to Sunday
    d. Yardi Report - Unit Statistics – parameters set as of Sunday
    e. Yardi Report - Aged Accounts Receivable Summary (i.e., Tenant Delinquent Report); - live report, pulled for current date for Current, Notice and Eviction status (excluding future and past)
    f. Yardi Report - Lease Expiration – live report
    g. Yardi Report - Rent Roll with Lease Charges – live report
    h. Yardi Report - Lease Activity Report - pulled from prior Monday to Sunday
    i. Yardi Report - Lease Trade Out – live report
    j. Yardi Report – Open Work Order Report – live report
    k. Yardi Report – Projected Occupancy Report – pulled for 8 weeks or 60 days
    l. Revenue Management – Pricing Report

<u>MONTHLY REPORTS</u>

To be provided to Owner by end of day Business Day* 5 following a month's end updated with the prior month activity recorded.

1. Manual Report - Renovation Tracker
2. Manual Report - Market Survey - detailing leasing activity at the Property, the competitive environment vacancy rate for the relevant market in which the Property is located for the current month.
3. Manual Report - Renewal Tracker
4. Manual Report - Property Exterior Lighting Audit
5. Manual Report – Preventative Maintenance Checklist
6. Satisfacts Surveys Move-in Surveys
7. Satisfacts Surveys – Work Order Surveys

<u>QUARTERLY REPORTS</u>

To be provided to Owner by end of day Business Day* 14 following a quarter's end.

1. Manual Report – Life and Safety Inspection
2. Manual Report – Leasing Shop Report

<u>SEMI ANNUAL REPORT</u>

To be provided to Owner by end of day Business Day* 5 of the first and seventh month in a calendar year.

1. Manual Report – Unit Inspection